(98 App. Div. 247)

WELK v. JACKSON ARCHITECTURAL IRONWORKS et al.

(Supreme Court, Appellate Division, Second Department.   November 18, 1904.)

1. MASTER AND SERVANT—INJURIES TO SERVANT—DEFECTIVE SCAFFOLDING—LABOR LAW.

Perpendicular columns having been set up in the erection of a steel building, a beam was hung from one column to another, and lashed to them by ropes, for the purpose of holding the iron girders until the wall was erected between the beams, and also to furnish a place for the employés to walk in spacing the girders.   *Held*, that such timber was

a scaffold, within Labor Law, § 18 (Laws 1897, p. 467, c. 415), providing that an employer shall not furnish or erect, or cause to be furnished or erected, for the performance of labor in the erection of a house, scaffolding which is unsafe or improper to give proper protection to the life and limbs of employés.

2. SAME—FINDINGS—EVIDENCE.

In an action for injuries to a servant from the turning of a beam on which he was directed by his foreman to go, evidence *held* to warrant findings that plaintiff went upon a completed structure for the performance of a duty to defendant, that the beam was not so placed or constructed as to afford proper protection, and that the same was furnished as a scaffold by defendant.

3. SAME.

Where defendant directed the erection of a beam between two iron columns of a steel building, which beam was lashed to the columns with ropes and used as a scaffold, and the work of lashing was so negligently done that when plaintiff, a steelworker, went on the beam as directed, it sagged and turned so that plaintiff was precipitated into the cellar and injured, defendant was liable therefor under Labor Law, § 18, requiring the master to provide and furnish safe scaffolding for the protection of life and limbs of employés.

4. SAME—DAMAGES—EXCESSIVENESS.

Plaintiff, a steelworker, was precipitated four or five stories to the cellar of a building by reason of the insufficiency of a scaffold, and sustained a fracture of the tibia, both wrists, and of the skull. He was unconscious for two weeks, and remained in the hospital for two months. He then walked on crutches for three months, and did not return to any kind of work for six months. He sustained an almost total loss of the sight of one eye, and, though there was a good union between the bones broken, the left wrist was permanently deformed, the right partially so, and his leg was permanently deformed and injured. *Held*, that a verdict of $9,000 was not excessive.

Woodward, J., dissenting.

Appeal from Trial Term, Queens County.

Action by Joseph Welk against the Jackson Architectural Ironworks. From a judgment in favor of plaintiff, and from an order denying defendant ironworks' motion for a new trial, it appeals. Affirmed.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and HOOKER, JJ.

Frank Verner Johnson (Robert Thorne, on the brief), for appellant. Charles Caldwell, for respondent.

JENKS, J. The action is by a servant against a master for negligence. The master was putting up an iron and steel building, and a structure upon which the servant was working sagged or canted so that the servant lost his balance and fell from the height of four or five stories. The jury found for the plaintiff, and the defendant appeals. The case was tried on the theory that the master was liable under section 18 of the labor law (Laws 1897, p. 467, c. 415).

I think that the structure was a scaffolding within the purview of this section. Perpendicular columns had been set up, and the structure was a beam of timber 15 or 20 feet long, 3 or 4 inches thick, and 12 inches wide, hung from one perpendicular column to another, and lashed to them by ropes. The plaintiff testifies that before the wall was built this structure was necessary for the iron girders to rest upon; that it was a scaffold to walk across and for the beams to rest upon; that it was intended to be used in placing the iron girders at proper inter-

vals—"to walk on and space them at a right distance"; that it was there for the workmen to walk on to release the sling, and that there was no other way in which he could do it.   He is essentially corroborated by several witnesses.   Lord Brampton, in Hoddinott v. Newton Chambers & Co., L. R. App. Cas. 1901, p. 49, adopts and approves language of Rigby, L. J., in Maude v. Brook, L. R. 1900, 1 Q. B. 575, which is pertinent to this case.   This fabric was a "temporary structure upon which workmen stood in erecting the walls of a building," and thus within the definition of the Century Dictionary, as well as "a platform temporarily erected during the progress of the structure for the support of workmen and material," and thus meets the definition in Knight's Am. Mechan. Dictionary.

There was evidence which warranted the finding that the plaintiff went upon a completed structure, for he testifies that it was lashed— it was tied or lashed around the girders.   Miller and Olsen, the servants of the defendant, did the lashing at the ends respectively.   The plaintiff testifies that he "gave Miller a hand to lash it, and then went over in the center to take the sling off," but before going upon the structure he looked over to Olsen's end, which was the further end, to see whether he had it tied; it was tied; that after that Cooper, who had charge of the immediate gang, asked Olsen whether it was "all right"; Olsen answered "Yes"; and that thereupon, under Cooper's order, he went out upon the structure.   Plaintiff's witness Pettorine testifies that after the plaintiff fell from the structure it was still tied, but "looked a little bit sideways."   There was evidence to sustain a finding that the plaintiff, at the time of the accident, was about his master's work.   The plaintiff testifies that Cooper told him to take the sling off, and also to give Olsen a hand on some beams which were to be prepared to be set.   Cooper admits that he sent the plaintiff to give Olsen a hand, but at first testifies that he does not remember telling him to take off the sling as he crossed the beam, and then that he did not tell him to do it.   Cooper testifies first that there was no sling on, but afterwards that there was a rope which answered that purpose.   The defendant's witness Olsen testifies that there was a sling very near the center of the beam.   I dwell upon this feature of the testimony because the plaintiff testifies that Cooper told him to release the sling, and that there was no way to do this save by walking out upon the structure.

There was evidence which warranted a finding that this scaffolding was not placed or constructed so as to afford proper protection.   The plaintiff testifies that it sagged and canted about six inches so as to throw him off.   He is corroborated as to the sagging by his witnesses Haley and Shebill and by defendant's witness Cooper.   True, the defendant's witness Olsen testifies that his end was not lashed at this time, but that he was engaged in lashing it, having one turn around it; but he further testifies that the lashing used was a rope about 20 feet long, three-quarters of an inch thick, and that "it was wet and stiff, but otherwise a good rope for the purpose."   If the jury credited the testimony of the plaintiff that Olsen's end was tied, that Olsen told Cooper that it was "all right," and of his witness Pettorine that after plaintiff fell the scaffold was still tied, but "looked a little bit sideways," it was justified in finding that it was improperly tied by Olsen, or was tied by a

rope that was "wet and stiff, but otherwise a good rope for the purpose." I think that the tying to an iron column by a "wet and stiff rope otherwise good" may account for the sagging or wobbling of the beam after the plaintiff stepped upon it.

There was evidence to justify the finding that the scaffolding was furnished or erected, or caused to be furnished or erected, by the master. Class, the general foreman, testifies that he saw the timber, and knew it was being put up. Defendant's witness Olsen testifies that Cooper, the foreman of his gang, directed him to lash the end of the timber. Cooper testifies that he was engaged in lashing the beam when Welk came up. Olsen and Miller, who were at work lashing the ends, were both servants of the defendant. I think that the jury, then, were justified in holding the master liable under section 18 of the labor law, on the ground that he was responsible for the safety of the scaffold and for the want of care in the details of its construction (Stewart v. Ferguson, 164 N. Y. 553, 58 N. E. 662), "without exception upon account of his ignorance or the carelessness of his servants" (Id.; Tierney v. Vunck, 97 App. Div. 1, 89 N. Y. Supp. 612).

It cannot be said as a matter of law that the plaintiff was chargeable with contributory negligence. He was an ironworker by trade. The scaffolding was apparently lashed and tied at both ends, for the plaintiff looked over at the other end, and saw that it was tied, and he heard Olsen assure Cooper that it was "all right" before Cooper told him to proceed upon the scaffold. Nothing shows that in the exercise of due care he could foresee that the further end was so insecurely lashed or tied as that it would sag or wobble if one walked upon it. Olsen says that the rope was wet and stiff, but otherwise a good rope for that purpose. Nor does the mere fact that the plaintiff assisted Miller in lashing an end, if he did so, make him guilty of contributory negligence as a matter of law. Wingert v. Krakauer, 76 App. Div. 34, 78 N. Y. Supp. 664.

The plaintiff lay in the hospital unconscious for two weeks, and remained there for two months. He then walked upon crutches for three months, and did not return to any kind of work for six months. His strength is impaired, his eyesight is affected, and he cannot now work save in a different field of labor. His physician testifies that he had a fracture of the tibia, fracture of both wrists, and fracture of the skull, and that there is almost a total loss of sight of one eye. He also testifies that, though there is a very good union, the left wrist is permanently injured and deformed, and the other partially so; his leg is permanently deformed, and permanently injured, and it will always be the cause of suffering; and there is a partial paralysis of the optic nerve. No testimony is offered by the defendant on the subject of the injury. We cannot say that the verdict of $9,000 is excessive.

The judgment and order should be affirmed, with costs. All concur, except WOODWARD, J., who reads for reversal.

WOODWARD, J. (dissenting). I cannot concur in the view taken by the majority of this court. The plaintiff was employed with others in the general work of erecting the iron framework for the annex to the New York Hospital. The workmen appear to

have been subdivided into gangs, and the plaintiff was called from one gang to assist in the work of a second gang. This latter gang were engaged in placing a timber 15 or 20 feet long, 12 inches wide, and 3 or 4 inches thick, between two perpendicular iron posts, the purpose of the timber being, when lashed to such perpendicular posts, to support the horizontal iron girders until the wall of the building was constructed up to them, when they would be imbedded in the wall, and this timber could be removed. This was a necessary part of the work in constructing the ironwork for the building. When the plaintiff arrived on the scene, the workmen were just getting this timber in place, it being carried up by a derrick. Two of his fellow employés at either end were expected to receive the timber as it came into position, and to make it fast with ropes, and this was done. It appears from the evidence that one of the workmen was asked if the timber was all right, and, on being answered in the affirmative, the foreman of the gang ordered the plaintiff to unfasten the fall or drop rope from the derrick which drew the timber into place, and to "lend a hand" to Olsen in finishing the lashing of this timber to the post. The plaintiff walked along the timber, unfastened the fall, and then walked toward Olsen's end of the timber. When within about six feet from the end, the timber turned partially over, and the plaintiff was precipitated to the basement below, sustaining serious injuries.

It seems to be conceded that under the common law this would impose no obligation to pay damages upon the defendant. But it is urged in behalf of the plaintiff, who is endeavoring to sustain a verdict for $9,000 damages, that the timber as thus lashed to these iron posts constituted a scaffold under the provisions of section 18 of the labor law (Laws 1897, p. 467, c. 415), and some of the plaintiff's witnesses testify that the timber as thus placed constituted a scaffold; that it was designed for the men to walk over in placing or spacing the girders, etc., thus bringing it within the letter of some of the definitions of a scaffold. In the view that I take of the question, it is not very important to determine whether this timber, lashed to posts at either end for the primary purpose of supporting the iron floor beams or girders until the walls could be built up around them, constituted a scaffold or not, but I am fully persuaded that, if the Legislature which adopted this act could see this beam in position, knowing its primary purpose, it would be very reluctant to say that it contemplated such a situation; and this is the true test of construction, and especially of statutes enlarging the scope of the common law. Riggs v. Palmer, 115 N. Y. 506, 510, 511, 22 N. E. 188, 5 L. R. A. 340, 12 Am. St. Rep. 819, and authorities there cited. This temporary wooden beam, conceding it to have been intended incidentally for the workmen to walk over in placing the iron beams, was no more of a scaffold than the iron beams which were to be laid upon it, and which the workmen would have to walk over more or less in the performance of the details of the labor; and it seems to me entirely clear that this beam was not designed as a platform to work upon,

but as a mere temporary support for the iron beams, with the same incidental purpose of use in walking over as any of the other timbers used in the construction of the building. ·The mere calling of a beam a scaffold does not make it so unless the object for which it was primarily designed was that of a scaffold, and I do not believe that any man seeing this beam in position, and knowing the purpose for which it was placed, would ever think of referring to it as a scaffold, unless he was anxious to bring his case within the purview of the labor law.

But assuming that it was a scaffold, made necessary as a detail of the work of placing the iron girders, is the defendant liable? The plaintiff was not called upon to go to work upon a completed scaffold. He concededly went upon it for the purpose of removing the fall rope and to "lend a hand" to Olsen in fastening the end of the timber, and this was as much a detail of the work as it would have been if they had been placing an iron girder and the plaintiff had stepped upon it before it had been properly fastened by one of his fellow servants. If the master had been there in person and had superintended the work he would not have been liable for the neglect of the plaintiff's fellow servant in fastening the beam, nor for the imprudence of the plaintiff in stepping upon the timber before making certain that it was securely fastened, particularly as it appears from the plaintiff's own testimony that it was not necessary for him to go over this timber to reach Olsen, where he was to "lend a hand," and the only purpose for which it was necessary for him to go upon the timber was to remove the fall rope, which was essentially a detail of the work of placing the timber.

It seems to me that section 18 of the labor law is given its legitimate effect when the employé is given a cause of action for the neglect of the master in furnishing a safe scaffold, where it is the duty of the master to furnish such scaffold. If this so-called scaffold had been erected by the master, and the plaintiff had been called upon to perform some service which required his presence upon the beam, and the beam had turned over and produced the fall, there would be reason for holding the master liable; but when we find the plaintiff engaged in a general employment necessitating the placing of this beam for the primary purpose of supporting the iron girders, and the latter is injured by a failure on the part of fellow servants to securely fasten the beam, it is hard to conceive of any duty which the master owed the plaintiff and which he has failed to discharge. If the law has reached a point of development where the master must personally attend each detail of construction, and must personally test each step of the laborer in order to determine that the latter may perform the work in safety, it is well that the fact be known that employers may protect themselves either by adding to the contract price sufficient to pay for this added burden, or by such other means as may be pointed out.