THE PEOPLE OF THE STATE OF NEW YORK, on the Complaint of MATTHEW GREEN, Complainant, v. N. A. WILLIS, Defendant.

City Magistrates' Court of New York, Borough of Queens, Second District, Sitting as a Court of Special Sessions, February 14, 1940.

*William C. Chanler, Corporation Counsel* [*James Hurley* of counsel], for the People and the complainant.

*Herman Wollitzer*, for the defendant.

SAVARESE, C. M. This case was tried before me, sitting, with defendant's consent, as a Court of Special Sessions held by one city magistrate. I, therefore, decide the controversy on the merits. The substantial facts are not in dispute.

The defendant is the agent of the owner, and as such is in control, of a certain plot of vacant land on the north side of the World's Fair boulevard, about 325 feet east of Queens boulevard, Elmhurst, Queens county.

Sometime in 1890, before consolidation, when that territory was nothing but marshy ground, the then town of Newtown, by appropriate condemnation proceedings, acquired easements through lands of which the plot in question was a part, and constructed a ditch about ten feet average width, which, in a zig-zag course, drained the surrounding lands of ground water and eventually emptied in Flushing bay. The condemnation order provided that this drain, which became known as " Horsebrook creek," should be " maintained forever."

The original purpose of the drain, which was to impede the propagation of the mosquito in the then malodorous Flushing swamps, became outdated with the growth of the city, and the creek was eventually filled in. Testimony, and the blueprint in evidence, prepared September 16, 1937, by a surveyor of wide reputation, show that to be the fact.

However, about seventeen years ago, some time after the construction of "Horsebrook creek," and either before or after it was filled in, another drain was dug, whether by the city or not, it does not appear. It is shown on the blueprint as running diagonally, almost at right angles from "Horsebrook creek," northwesterly towards the rear of defendant's property to Queens boulevard. I find that this ditch, also artificially made, did drain part of defendant's land, and that some underground water still runs through it to a concrete pipe. Formerly, this pipe carried the water underground, across the World's Fair boulevard, back to "Horsebrook creek," as it continued its devious course on the south side of the boulevard. All that is changed now, because the creek has been filled in, the pipe empties into the sewer, and the change in grade of the highway makes necessary the filling in of the surrounding lands.

Recently, the defendant, wishing to develop his land by erecting a building thereon, caused the ditch upon his property to be filled in, up to a point about 100 feet north of the boulevard, when the filling in process was stopped by the board of health, which issued an order to reopen the ditch, for disobeyance of which, this proceeding followed.

The defendant is charged, specifically, with obstructing and filling in with dirt a "natural drainage system" on premises controlled by him, in violation of section 183 of the Sanitary Code. So far as material that ordinance reads as follows:

"Sec. 183. Nuisances; conditions dangerous or prejudicial to life or health; duties of persons responsible. It is hereby declared to be the duty of every owner, * * * of * * * any * * * ground, * * * and of every * * * department, having charge of any ground, * * * to keep, place, and preserve the same and the sewerage, drainage, and ventilation thereof in such condition, and to conduct the same in such manner that it shall not be a nuisance or be dangerous to or prejudicial to life or health."

In view of the specific charge, therefore, the solution of the question at bar does not depend upon any riparian or prescriptive rights in the ditch in question, as distinguished from any such rights or easements in the original drain known as "Horsebrook creek," which is no longer existent, and as to which any easements have become extinguished. Both drains were man-made. The first one, "Horsebrook creek," was acquired by condemnation, which imports just compensation. The latter ditch, that is, the ditch here involved, was constructed not along the lines of the creek, but almost at right angles thereto. There is no evidence as

to who constructed the ditch. Contrary to the charge, the fact is that this ditch is not a natural drain, but an artificial one. If it was dug by the public authorities, their right to do so upon private lands does not appear from the record, and if it was made by the owner of the land, no duty appears to be imposed upon the owner, as an obligation running with the land or otherwise, by either common law or statutory requirements, to keep it unobstructed in perpetuity, for the benefit of his own premises or those of other landowners.

That the ditch was maintained by the sewer bureau for many years does not affect the legal question before the court, whether the bureau considered itself in duty bound to maintain it under chapter 410 of the Laws of 1892, or not. It is held that the administrative officers of a city have no authority to convert a private drain into a public one, without acquiring the property on which the drain is located, nor is there any duty upon the city to maintain the private drain and keep it unobstructed. (*Kosmak* v. *Mayor, etc., of N. Y.*, 117 N. Y. 361.) There is nothing in section 183 of the Sanitary Code casting any duty upon the municipal authorities to take " charge " of a private ditch such as the one under consideration. Nor could the city be compelled to keep the ditch unobstructed. (*Kosmak* v. *Mayor, etc., of N. Y., supra.*)

The question is not whether the ditch was dug unlawfully, but simply whether, having been dug, is there a continuing duty to keep it in its original condition indefinitely? I do not perceive any such legislative mandate in the ordinance expressly relied upon by the city in this prosecution. The corporation counsel concedes that there is no precedent in point, in this State, and the court's own research has not produced any.

Section 183 makes it the duty of every owner to maintain the " ground " and " the sewerage " and " drainage " thereof in " such manner that it shall not be a nuisance or be dangerous to or prejudicial to life or health." A similar duty is imposed upon the department having " charge " of any such ground.

The corporation counsel urges that the mere filling in of the ditch is a nuisance *per se*. His position is untenable, because the very ordinance invoked makes the existence of a nuisance, or danger, or prejudice to life or health, a factual question, and a condition precedent to the establishment of guilt, especially where, as here, the action is based upon a statute penal in character, which must be strictly construed. A provision of the Sanitary Code, under which fine or imprisonment may be imposed, is a penal statute. (*People* v. *Sturgis*, 121 App. Div. 407.)

There is nothing either in the letter or spirit of section 183 of the Sanitary Code prohibiting this defendant from filling in the ditch. No such sweeping intent could be attributed to the legislation, without drawing into play basic constitutional questions relative to vested property rights. To require that lands shall be maintained so as not to constitute a nuisance or be dangerous to health, is not the equivalent of saying that a ditch, however long in use, may not be discontinued, especially if it is part of one's own property. Except for interference with public rights, such an act is inherently lawful. But even if it could be reasonably said, to which I do not subscribe, that such a prohibition may be read in the letter of section 183 of the Sanitary Code, I hold that it could not be within the intention of the lawmakers, and, therefore, it is not within the statute and must be disregarded. (*Riggs* v. *Palmer*, 115 N. Y. 506, 509.) I incline to the view that the plain letter and spirit of the regulation aim to interdict a condition which, through the endangering of the health of one or more persons, shall be constructively a public nuisance. (*People* v. *Sturgis, supra.*) The fundamental and commonly recognized attributes of a public nuisance are the same whether at common law or by statutory regulation. This ordinance was plainly not designed to reach the situation at bar, and this, therefore, is not a *casus omissus.* " Public nuisances are founded upon wrongs that arise from unreasonable, unwarrantable or unlawful use of property, or from improper, indecent or unlawful conduct working an obstruction or injury to the public and producing material annoyance, inconvenience and discomfort." (*Bohan* v. *Port Jervis Gas-Light Co.*, 122 N. Y. 18.) To establish the nuisance, evidence is always essential to show the injury in fact. So it is, where sewage pollutes a stream (*Fonda* v. *Village of Sharon Springs*, 70 Misc. 101; *Lawatsch* v. *City of Kingston*, 68 id. 236), or where the course of water is deflected or obstructed (*Prime* v. *City of Yonkers*, 192 N. Y. 105), or where a creek is filled up and a sewer pipe is substituted. (*Hentz* v. *City of Mt. Vernon*, 78 App. Div. 515.)

There is no evidence before this court of any of the requisite elements of a nuisance and until it is established as a fact, that the filling in of the ditch and the raising and leveling of the ground to the new grade are " dangerous to or prejudicial to life or health " within the express provisions of Sanitary Code, section 183, there is no crime proven.

The learned corporation counsel points to a case decided in North Carolina (*State* v. *Wilson*, 107 N. C. 865; 12 S. E. 320) as " on all fours " with the one at bar, where it was held in a criminal prosecution that the defendant had no right to obstruct a drain

constructed by the city on his land, without condemnation, so that a street was flooded. An examination of that citation reveals that the action was by authority of a specific ordinance which prohibited the obstruction of " any water so that the water shall accumulate in any street." The placing of the obstruction and the consequent flooding were held to be a clear violation of the ordinance, irrespective of the owner's rights of property. The decision was placed upon the ground that " no person, not even an adjacent owner, whether the fee of the street contiguous to his lot be in himself or the public, has the right to do an act, which makes the use of the street hazardous or less secure than it was left by the municipal authorities." Obviously, the situation there was much different from the one at bar. There, the actual danger to a public street ensued from defendant's act which was expressly prohibited, and the dangerous condition was established by proof. Here, by analogy, no prejudice or danger has been shown to exist to life or health, within the provisions of the particular ordinance. The other case in Iowa (*McGregor* v. *Boyle*, 34 Iowa, 268), also cited by the corporation counsel, proceeds upon grounds similar to the *Wilson* case (*supra*).

It, therefore, follows that no violation of the ordinance in question has been established and the defendant is, therefore, acquitted after trial on the merits.

I might add the following observations, prompted by a keen sense of civic pride. From the physical conditions present now, it would appear that the complete filling in of the remaining portion of the ditch has become a necessity, since the excavation is partly filled with refuse, besides stagnant and putrescent water. It is my considered opinion, frankly here expressed, that rather than impede this owner in developing his land, the municipal authorities should encourage a prompt disposition of the matter by lending him a helping hand, and suggestions on how to cope with the obvious need of building some sort of subsurface retaining wall or culvert to prevent dirt and fill from clogging the pipe under the line of the sidewalk, so that the flow of what will be subsurface water may continue. This property, located as it is upon the World's Fair boulevard, close to Queens boulevard, two of the main thoroughfares of Queens borough, has undoubtedly become quite valuable, craving for improvement. Years ago, in a different age, and its " horse and buggy days," beloved to some of us surviving, and bringing back tender memories of childhood vagaries, that section of Queens borough involved in this controversy was sparsely settled, and as far back as " the mind of man runneth not to the contrary," was the westerly limit of the then infamous Flushing

swamp with its prolific mosquitoes of every size and species, preying upon the helpless inhabitants of adjacent communities. The march of time, the living organism of human progress, the growth of the city and of the borough, have worked havoc with all that. What were the endless and dreaded swamps have been transformed by the magic of human genius into the World's Exposition Grounds, the most beautiful and instructive assemblage of products of human endeavor ever gathered together for astonished eyes to enjoy. But a short distance from this lowly ditch, multitudes of peoples from near and distant lands congregate and admire the manifold panorama of science, art, skill, industry and human ingenuity. Progress is depicted and dramatized at every hand. Little do our welcome visitors know, or care, of the turmoil this antiquated ditch is causing and of its insignificant place in contemporary local history. The city fathers charged with the duty dictated by the rapid strides of civilization, should exert all efforts to beautify every corner of our great borough and make it the cynosure of all eyes. The elimination of this obscure but odious ditch, as a salutary step towards the removal of eyesores wherever possible, would undoubtedly be welcomed and acclaimed. Defendant discharged.