In the Matter of Proving the Last Will, etc., of LORENZA M. SHELDON, Deceased.

(*Surrogate's Court, Madison County, Filed September* 23, 1891.)

1. WILL—PROOF—LEGACY TO DRAFTSMAN.

Where a testator has that mental and physical vigor which is essential to make a valid will, it is not the law that the draughtsman of a will, even if he holds confidential relations to the testator, cannot be his executor or take a legacy thereunder, nor can fraud be presumed where the will contains such provisions, nor evidence be required to show that it was made freely, without fraud or undue influence.

2. SAME—UNDUE INFLUENCE—CONFIDENTIAL RELATIONS.

A mere agency to transact business in relation to investments in another State, where the principal takes little or no part in its management, does not create business relations of that confidential character from which will ordinarily arise any legal presumption of undue influence in the making and execution of a will drawn by the agent and containing a legacy to himself.

3. SAME—EVIDENCE.

On probate of a will, it need not be shown that the testator gave directions for making it, or that it was read to or by him. Knowledge of its contents will be presumed from his having signed it, and his declaration that it is his will.

4. SAME.

Testatrix, who had no ancestors or descendants surviving, by her will, gave to certain nephews and nieces, with whom she had little communication, legacies of $500 and over, and the balance of her estate to a nephew who drew her will, his adopted son and grand-nephews and grand-nieces, children of a niece, share and share alike. *Held*, that the inequality of the legacies did not show undue influence, and that the will should be admitted to probate.

Probate of will.

Joseph Mason and John E. Smith, for proponent; Hopkins & Aldrich, of Aurora, Ill., and James S. Sherman, for contestant.

KENNEDY, S.—The testatrix was a resident of Brookfield, in this county. The will was executed at the house of her nephew,

Truman H. Day, at Aurora, Ill., she at that time being on a visit to him at that place. She left property valued at nearly $40,000, substantially all of which was represented by securities in the hands of said Day, who, for fifteen years previous to her death, had acted as agent in making investments for her, rendering annual statements to her and remitting such sums as she desired for her personal use. The will was executed on the 19th day of October, 1886, and the testatrix died on the 24th day of December, 1890, at the age of eighty-four years. At the time the will was executed she was in the enjoyment of her usual health, and so continued until a short time before her death. She was a woman of ordinary intelligence, had a clear understanding of her business affairs, and had the legal capacity to make a will and dispose of her property with a thorough knowledge of its amount and character and of her relation to those who would have been her heirs if she had died intestate. Her husband was dead, and her only heirs and next of kin were a sister and a number of nephews and nieces. By her will, after providing for her funeral expenses, she gave legacies to various nephews and nieces, none less than $500, amounting in all to the sum of $14,000. After which she gave her residuary estate of $21,000 to said Day, his adopted child, and eight grand nephews and nieces, children of her niece, Sarah H. Jones, share and share alike.

All the formalities which the law requires were observed in the execution of the will, but its validity and proper execution are challenged by Solumnus D. Seaman, one of her nephews, residing at Aurora, Ill., on the ground of Mrs. Sheldon's alleged incapacity to make it; and also on account of the alleged fraud and undue influence of said Day in the preparation and execution of the will. On the trial there was no evidence from which the lack of testamentary capacity could be inferred, nor any affirmative evidence of undue influence; but notwithstanding this, the contestant insists, because it appears from the evidence the will was drawn by Mr. Day while she was at his house, and he was made an executor of, and a legatee under the will, and

further, that for many years he had acted as her agent in the management of her estate in Illinois, that the will was the product of fraud and undue influence on his part.

·The contestant claims that, under such circumstances, the proponent must give other than the usual evidence of the witnesses to the will, before it can be admitted to probate; that it must be shown the testatrix gave directions for its drafting, which were obeyed, or that it was read to or by her before its execution, and bases this proposition of law upon the ground that where the writer of a will has confidential relations with the testator, and the will makes him an executor or legatee thereof, such a presumption of fraud and undue influence arises that the ordinary proof of the execution of a will thus made does not rebut or outweigh such legal presumption; that the proponent must show, in addition thereto, that the will was made freely, without fraud and undue influence, and that the proponent should establish by affirmative evidence that none of the provisions of the will were dictated, suggested or brought about by his instigation.

The rule of law which the contestant invokes applies only to that class of cases where by reason of sickness, old age, mental and physical condition or other circumstances, the testator had not that health, intellectual vigor, independence of character, freedom of action and judgment to guard his rights and protect himself and his estate from the stealthy tread of those who would illegally take what he had designed for others.    We shall hold that where a testator has that mental and physical vigor which is essential to make a valid will, it is not the law that the drawer of a will, even if he holds confidential relations to the testator, cannot be his executor or take a legacy thereunder; nor is it the law that if the attorney, physician or priest of the testator draw a will in which there is a legacy to himself, that such will or such legacy is presumed to be fraudulent, nor in such a case is fraud presumed in aid of those who seek to overthrow the will; nor does this fact, in the absence of evidence, warrant the presumption that the testatrix was unduly influenced , or was

improperly or fraudulently controlled in making her will. All that can be legally claimed for such a state of facts is that it may or may not be a suspicious circumstance; but whether it is or not depends upon the facts of each case.

The fact that a beneficiary is the attorney, guardian or trustee of a decedent does not of itself alone create a presumption against a testamentary gift; neither is it presumed to have been procured by fraud and undue influence in every case and under all circumstances; nor does that single fact call upon courts to pronounce against a will thus executed unless additional evidence is produced to prove knowledge of its contents by the deceased. It is only in that class of cases where the testator excludes the natural objects of his bounty that a will in favor of his attorney, physician, priest, is looked upon by courts with suspicion. To invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such influence can be inferred. It is not sufficient that the party benefited by a will had the motive to exert such influence; there must be evidence that he did exert it, and so control the actions of the testator either by importunities which he could not resist, or by deception, fraud, or other improper means, that the instrument is not really the will of the testator. If a contestant alleges fraud and undue influence, or any other defense, it is his duty to prove it, because fraud is never presumed from the existence of an opportunity to commit it. It must be established by such evidence that the influence of wrong doing follows as a natural and unavoidable result, and it is only so established when such facts are proven that no other legitimate conclusion can be drawn. Justice to testators, heirs and legatees does not demand such a rule of law as the contestant seeks to maintain, nor is there any necessity for its existence. If such were the law, testators would, many times, be debarred the aid of an attorney, relative or other person in whom they had the most implicit confidence, and whose legal ability, knowledge of the testator's affairs, or other circumstances made it especially necessary to have such person draw the will, provided he desired to

remunerate him for services rendered or to be rendered, or for faithfulness to his interest, or from any other proper motive wished to give him a legacy. To say that every lawyer, doctor, minister or other person holding confidential relations with a testator, who draws a will with a legacy to himself, is, from that simple fact alone, presumptively dishonest, his motives and his acts presumptively fraudulent and wicked, and the will presumptively the product of undue influence, is to assert a proposition of law which is not now, never has been, and probably never will be the law of this State.

The thief, the burglar and the assassin is each presumed to be innocent until the court, upon legal evidence, and after a fair and impartial trial, has imposed the sentence which the law demands for his crime. But, if the law is as the contestant claims, a reputable citizen known far and wide for his ability and unquestioned moral character happens to be on confidential terms with a testator, who clearly and thoroughly understands his own business, and appreciates his duty to others, draws a will for him, he is denied the legal rights given to every criminal, and must prove that he is not guilty of any wrongdoing or fraud, and undue influence, before there is any evidence that he has violated any law whatever or done injustice to any one. The law presumes every person to be of good character, and he is not to be deprived of the benefit of this legal presumption because he happens to be an attorney, physician, minister, confidential friend, adviser or business manager, and draws a will with a legacy to himself, which a competent testator knowingly, deliberately, intentionally, voluntarily gives to him; nor under such circumstances ought he to be compelled to go into court and by witnesses establish the fact that he is not a scoundrel, when there is not the slightest proof that he has done a wrongful act towards the testator, or any one interested in his estate. The presumption which the court is asked to recognize makes no allowance for the character of men who draw such wills; all are alike condemned, irrespective of their known integrity, their prominence in social or business affairs, their private or pro-

fessional standing; makes no allowance for the age, mental and physical condition of the testator, the amount of his property, the nature of the relations existing between him and his heirs, the financial condition of his relatives, their good or bad character; makes no allowance for the fact that if the beneficiary writing such a will is a near relative who would take a considerable share of the estate if there were no will, the same presumption which might arise against a stranger is not applicable to him. Courts do not thus quickly, easily and unnecessarily rob the drawer of a will of his good name and fame because somebody alleges or imagines his confidential relations with the testator were influential in obtaining a legacy to himself. The dead are not here to explain their motives or their acts, and the law in this State, under some circumstances, prevents the legatee and writer of the will from disproving the insinuations of the accuser by his own evidence. Under such circumstances it is better, more in accordance with the procedure of courts in other judicial proceedings, to wait and hear the evidence before rendering judgment.

If the draughtsmen of wills could choose their own time and occasion, had opportunity, and it were possible to surround themselves with witnesses who would be sure not to die until the will was offered for probate, such a presumption of law upon the proof of wills might be harmless; but in view of the fact that this cannot be done, it would seem but fair and just to those who draw wills of competent testators, with legacies to themselves, if they are persons of good character, to presume they have discharged their duties toward the testator, his heirs or legatees, fairly and honestly, and are not presumptively guilty of fraud and undue influence.

> " Though in the trade of war I have slain men,
> Yet do I hold it very stuff o' the conscience
> To do no contrived murder. I lack iniquity,
> Sometimes, to do me service."

Perhaps the suggestions we have made are unnecessary, for the reason that the legal presumption which the contestant urges

applies only to cases of contracts and gifts *inter vivos*, and does not apply in all its strictness to wills. The distinction between the rule affecting testamentary gifts and gifts *inter vivos* and contracts is well settled by American and English courts, and the law held to be that a will is not invalidated by the mere fact that it was written by the attorney, agent, physician, priest or other confidential adviser of the testator, who is himself a beneficiary. It is in courts of equity alone that if a gift or contract is made in favor of him who holds a position of influence that courts cast upon him the burden of proving that the transaction was freely conducted, as if between strangers; that the weaker was not unduly impressed by the natural influence of the stronger, or the inexperienced overreached by him of more mature intelligence. But in case of a legacy under a will, to cast upon the legatee, by reason of the relations he sustains to the testator, the burden of showing how the matter came about, and under what influence or with what motives the legacy was made, what advice the testator had, or by whom given, in many, if not in most cases, could not possibly be discharged. The natural influence of a person holding confidential relations with another may be lawfully exerted in his behalf to obtain a will or legacy, provided the testator thoroughly understands what he is doing and he is a free agent, and the volition of the testator, though biased and impressed by the relation in which he stands to the legatee, is not overborne and subjected to the domination of another.

Again, there is no presumption of fraud and undue influence, because there were no such confidential business or social relations existing between Mr. Day and the testatrix as the law recognizes as having a wrongful or controlling influence upon testators. Mrs. Sheldon sometimes went to visit him, and he some years came east to visit her and other relatives. She had never lived with him, her home was with her niece in this State, so that she saw him seldom and only for short times; for these reasons the opportunity for that constant and intimate association, that silent but effective influence which sometimes operates

upon the mind of a testator, did not exist. The only pretense that there were any confidential relations between them which might possibly be the basis of improper influence arises from the fact that Mr. Day had charge of her investments in Illinois, and paid to her such portions of the income as she desired.

> ———— "What drugs, what charms,
> What conjuration, and what mighty magic"

the contestant claims Mr. Day mads use of does not appear either from the evidence or the argument of his counsel other than from the facts above stated. To be the agent of another in some distant State for such a purpose does not of itself create those confidential relations which are influential in testamentary dispositions of property. It might with as much propriety be said that the directors of a savings bank, which receives and invests the money of its depositors, sustain such confidential relations to them that if a director drew a will for one of them with a legacy to himself, this fact alone would be presumptive evidence of undue influence and would require more than the statutory proof to admit the will to probate. A person who has legal business must ordinarily, and sometimes of necessity, employ an attorney, a person may be sick or injured and require the services of a physician or surgeon, in both of which cases there must of course exist relations of confidence and dependence which do not arise when one is simply the agent of another in regard to financial investments or business operations. In the one case the employer is wholly dependent upon the ability, advice and good judgment of his physician or attorney, while in the other the agent must conform to the wishes and judgment of his principal. In one case the relation is a matter of necessity; in the other it is a voluntary matter. A mere agency to transact business where the principal takes little or no part in its management and which from its nature does not require intimate and confidential relations for its performance, would not be likely to be the origin of, or be productive of, that fraud and undue influence which the law condemns in the making of

2

wills; hence, we shall hold that the business relations existing between Mr. Day and the testatrix were not of that confidential character from which would ordinarily arise any legal presumption of undue influence in the making and execution of Mrs. Sheldon's will. But if it were admitted his business relations were confidential, so is that which an attorney sustains toward his client, yet one's own lawyer has always been considered the most proper person to write his will, and it is regarded as an unfavorable circumstance when he is passed by and another person employed for that purpose, and a like reason would seem to make it extremely wise and proper and legal for Mr. Day to draw the will in question.

But the contestant also claims that the proof of the will and its execution were insufficient to admit it to probate, for the reason that it was not shown that the testatrix gave directions for making the will, or that it was read to or by her before its execution. If this were sound law, the legislature of this State should be called together at once for the purpose of passing some statute by which such evidence could be perpetrated when once a will has been executed. If such be the law, a large proportion of the wills now in existence could not be admitted to probate, because the person who drew the will, or those who may have been present at its execution, or knew of the factswhich the contestant insists must be proven in order to probate a will, might be dead or absent, or incompetent for many reasons to testify; in a word, the proof suggested could not be obtained. Such a law would compel a testator to provide some legal machinery, by which, at the proper time, it might be made to appear to the surrogate that he knew the contents of the will at the time of its execution even if no objections were filed against it ,because the surrogate must be satisfied that a testator knows the contents of his will before it can be probated. But in order to avoid the objection that the testator is not shown to have knowledge of the contents of his will, the law presumes that he is of perfect mind and memory; that he had legal capacity to make a will; that he had knowledge of, and assented to, all of its pro-

visions; that all the facts necessary to its validity existed at the time it was made; that its execution was valid, if the legal formalities are apparent upon the face of the instrument, or are proven before the surrogate; that in all respects it was designed, prepared and executed according to law.

The signature of a testator to his will ought to be and is regarded by the courts as evidence that it is his deliberate act, and that he would not have placed his name to an instrument which does not express his testamentary intention, and from this fact alone he is presumed to have known its contents, to have understandingly executed the same, and been aware of the legal effect thereof. By means of this legal presumption courts are enabled to admit wills to probate, thereby protecting the rights of heirs and legatees, and distributing the estate as the testator requested, which otherwise could not be done because of the inability of parties interested to prove, by living witnesses, or circumstances, that the testator knew anything about the contents of his will. Civilization makes legal presumptions necessary in courts to establish a fact, and in a proper case they are as satisfactory evidence as if witnesses had testified to the same.

In this case the witnesses to the will found the testatrix at her nephew's house with the will drawn and in her hands and ready for its execution; it was then signed by the deceased in their presence, and attested by them in her presence. It was spoken of by her as her will, and such she declared it to be, and it can hardly be supposed that a person of her intelligence and good health at that time would have executed a paper without knowing its contents, so that it may safely and legally be inferred that she was acquainted with the contents of the paper she signed. More than this, she had sent for these particular persons for witnesses to her will because they were old acquaintances and she preferred them to strangers, and so told them. This fact would indicate that she knew the contents of her will, and thoroughly understood what she was about to do, for the courts have held it to be a wise precaution, and a very proper

thing to do, for a testator to invite his old and intimate acquaintances to witness the execution of his will.

But while the law indulges in the legal presumptions to which we have referred, the absence of incapacity, of fraud and undue influence are very apparent from the provisions of the will, its manner of execution and the relation of the testatrix to the legatees.

As she had no children, and her blood flowed in the veins of no descendants, she was under no legal or moral obligation to consider her relatives entitled to her bounty. Being of sound mind, she had the undoubted right to dispose of her estate by will to whomsoever she chose. Her kinsmen had no vested rights therein and no interests to be protected by her. It is natural and reasonable that the property of a father or mother should go by will or law to their children or descendants. The fact that the legislature of this State has arbitrarily said that the property of an intestate having no living ancestor, children or descendants, shall go to collateral relatives, did not compel the testatrix to recognize them as having an expectant right to her property which she was in duty bound to take into consideration in disposing of her estate. As she had been under no legal obligations to support them while living, she was under no moral coercion or duty to provide for them after her death. She therefore had the right to use her own judgment, consult her own preferences without regard to whether such disposition of her property as she might make would be approved or disapproved by others. The natural objects of a testator's bounty are not always those whom the statute declares shall take the property of an intestate, but may depend upon the life they have lived; their habits, character, associations, their relations to, or association with the decedent, their wealth or their poverty, their success in business or their lack of it; their family and other social relations, their nearness to or remoteness from the testator's residence, and various other circumstances which might naturally and properly cause a testator to make, apparently, an unequal distribution of his estate. Some one who

has acted the part of a dutiful son or daughter, or friend, may naturally, reasonably, justly be the natural object of a testator's bounty in preference to relatives. The lengthening and weakening ties of blood may be severed by time, by the birth and growth of affections which seek another channel for their possession and enjoyment, or by other causes. The structures which human hearts may rear in early life will sometimes go to decay and be abandoned for castles which other hearts may build, and the stepping stones to which, though unseen by the passer by, may echo a welcome tread to listening ears and waiting hands within.

It may be very plausibly argued that inequality of legacies among collateral heirs equally related is no evidence of fraud and undue influence in making a will; that a testator without ancestors or descendants living is not obliged to inventory his assets and carefully take into serious and thoughtful consideration the number of his distant relatives and weigh with nice precision the extent of the pleasure or benefits he has received from each, or the quantity of affection or gratitude each has shown him; that as against such relatives he has the right to indulge in such regard, such prejudices or caprices, such likes or dislikes, as he sees fit to entertain; that he may consider any one, or all, or none at all, entitled to his property; that he may give to, or withhold from, them because of any motive or reason he may permit to influence him, without being legally subjected to the charge of incompetency, or of being unduly influenced, or of being required to apologize or explain to any one; that while such relatives have the legal, they have not the meritorious, standing in courts which entitle their pretended claims against a testator's will to the same critical and favorable consideration as if they were the children or descendants of the deceased, or were persons with whom he may have lived for many years; on whom he may have been dependent in sickness and health, and for whom he would be under those obligations which affection, gratitude, considerate helpfulness and intimate daily associations ordinarily bring into existence; so that in this case it

seems entirely natural and reasonable that Mrs. Sheldon should give the larger portion of her residuary estate to her eight grand-nephews and nieces, many or all of whom had been born beneath her own roof, been her constant companions from babyhood to manhood and womanhood, in whose happiness and prospects in life she must have taken a more than kindly, a motherly interest, whose daily lives with their joys and sorrows, their tears and laughter, must have been a part of her own existence, coupled to and inseparable from it, that those with whom she had so long lived, and by whom she expected to be watched and tended when

> "Age sat with decent grace upon her visage
> And worthily became her silver locks,"

and the dawn of another life was breaking over her horizon; that those by whose hands she expected to be buried, where the rising and the setting sun might cast its lights and its shadows alike, and at the same time upon her grave and the home and children she had loved; that such as these should be the natural objects of her larger and more liberal bounty, rather than to others, whose devotion to her interests, her comforts, her happiness and the performance of all those kindly offices so dear to the aged, she had never observed.

So, too, it was natural and reasonable that she should devote a large sum to provide a burial place and monument for herself and for her niece, with whom she had long made her home. Both of these legacies are of a character and amount, $6,000 in all, which she alone, and not Mr. Day, would be likely to suggest, and in which she would ordinarily take a deep interest at her time of life. They are such as would not be put into her will if she had been under his control, ready at all times to do his bidding and yield to selfish and miserly suggestions from him in order that he might receive a larger portion of her property. Wiser than many who rely upon affection or friendship not to leave their graves unmonumented and unremembered;

knowing that wealth descended or devised is sometimes parsimonious of its gifts to the dead; aware that forgetfulness and oblivion often come quickly to the departed; with a judgment which made no mistake, she provided the means and directed that to be done which should make her name as enduring as the marble or the granite whereon it should be written; although it might vanish from the memory of the living, thereby taking away all discretion which her executor might otherwise have as to the amount which should be devoted to burial purposes. This provision would seem to have been designed by one who, if fraud was attempted, disregarded it; if undue influence was exerted, overcame it; if greed and selfishness sought to give shape to this testamentary bequest they were powerless and harmless, thus leaving her in full possession of that judgment, that freedom and independence which testamentary capacity requires.

The absence of wrongdoing is also shown by the fact that if Mrs. Sheldon had died intestate, Mr. Day's share of her estate would have been $10,000, whereas by the will it is only $3,200, nearly seven thousand less than he would have had if there had been no will. If the testatrix was wholly under his control, willing to subscribe to any will which Mr. Day might impose on her, provided he was scheming and contriving to get as much of her property as possible, and had such influence over her that she would yield to any suggestion of his, it seems extremely probable that he would have so drawn the will as to increase, rather than diminish, the amount he would have had if there had been no will, or would have drawn such provisions that the larger portion of the estate would have fallen to him. All that was done seems to have been to his disadvantage, and if he made use of fraud and undue influence to procure the will, he was not sufficiently shrewd to be a gainer by his own wrong.

Her legacies to the contestant, his brother and sister, of $500 each, do not seem to be the result of anything save the ordinary reasons and influences which make discriminations among relatives of an equal degree. One nephew and niece live in Cali-

fornia, the other in Aurora, Illinois, and the evidence does not disclose that they ever wrote to her or she to them, or that either nephew ever visited her but once in this State, nor does it appear that they or the niece ever called upon her when at Aurora, or ever showed her the slightest attention whatever. It does not appear that either of them ever aided her in accumulating or caring for her property, or in any way assisted her or associated with her in such manner that she would be likely to have the same degree of attachment for them that she had for Mrs. Jones and her children, with whom she had lived so long and expected to live thereafter. And so of Mr. Day. For fifteen years he had acted as her agent in managing her property; there were almost yearly visits between them, and she undoubtedly felt that for his care of her estate, and his success in largely increasing it, over and above her support, he was entitled not only to a considerable remuneration for his services and his faithfulness to her interests, but to a larger share of her residuary estate than the Seaman heirs, to whom she was not under the slightest obligations for anything they are shown to have done for her either in a business way or socially. It is not improbable, but quite possible, that this lack of recognition of their old aunt, either by letters, or visiting or otherwise, if such was the fact, may have led her to think that while she remembered them in her will, the legacies were quite commensurate with any services they had rendered, or any attention they had shown her, and that for these reasons they were not entitled to share equally with those who nearly all their lives had contributed their services and their society to her, and made their days and years subordinate to her claims upon them for all that her age, her health, her comfort, her needs and her happiness required. Thick waters show no images of things, and it may be when she thought of disposing of her property, she saw not her image and superscription reflected upon one of the ancestral streams.

Nothing would seem more natural or business like, than for Mrs. Sheldon to have Mr. Day draw her will, as he was familiar with her property, had transacted her business, and knew her

relations with all her heirs. It would have been unnatural and contrary to the ordinary manner of doing such business that she should have gone to a stranger under such circumstances to have her will drawn. It is sometimes regarded as evidence of incapacity, and sometimes that fraud and undue influence exist, when a testator abandons those in whom they have always had the utmost confidence in the transaction of their legal and other business, and seek among strangers for that advice and assistance which is sometimes required in drafting wills. For the same reasons it was proper she should name Mr. Day as the executor of her will.

A decree will be entered admitting the will of Lorenza M. Sheldon to probate.

(Note.—Surrogate's decision affirmed by General Term without opinion, 65 Hun, 623; affirmed by Court of Appeals without opinion, 141 N. Y. 559; 57 St. Rep. 866.)