ROCHE v. NASON et al.

(Supreme Court, Appellate Division, Third Department. May 3, 1905.)

1. TESTAMENTARY CAPACITY.

A testator who has sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive their relations to each other and be able to form some rational judgment in relation to them, is a person of sound mind and memory, within the meaning of the statute of wills (Rev. St. pt. 2, c. 6, tit. 1, § 21), as amended by Laws 1867, p. 1927, c. 782.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 96–100.]

2. SAME—SANITY—SUICIDE.

The fact that a testator commits suicide is not alone sufficient to overcome the presumption of sanity.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, § 151.]

**3. WILLS—VALIDITY—EVIDENCE.**
    In an action to determine the validity of a will, evidence *held* to show that the execution of the will and codicil were the deliberate, intentional, and intelligent acts of the testator.

**4. SAME—WITNESSES—KNOWLEDGE OF CONTENTS.**
    Under the statute, it is not necessary that witnesses to a will shall know the contents thereof, and be able to testify on probate of the will that its provisions are the same as those of the instrument witnessed.

    [Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, § 310.]

**5. SAME—PAPERS COMPOSING WILL—PRESUMPTION.**
    Where the will consists of sheets of paper bound together, it is presumed on probate that the same sheets were so bound together at the time of the execution of the will.

    [Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, § 233.]

**6. SAME—WITNESSES—COMPETENCY—TRANSACTIONS WITH DECEASED.**
    In an action to determine the validity of a will, the wife of one of testator's next of kin, who was a party to the action, was incompetent to testify concerning personal transactions and communications with the testator.

    [Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, §§ 645, 664.]

**7. SAME—EVIDENCE—ADMISSIBILITY.**
    In an action to determine the validity of a will, testimony as to what witness heard in the family as to the insanity of certain of testator's ancestors was not admissible.

**8. SAME—HEARSAY.**
    In an action to determine the validity of a will, statements made by testator's mother to a physician and letters written by testator's mother were hearsay.

    [Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 1176.]

**9. SAME—WILL OF SUICIDE.**
    · A will· made by a person contemplating and who subsequently commits suicide is not invalid on grounds of public policy.

**10. SAME—PHYSICAL WEAKNESS.**
    Evidence of the enfeebled physical condition of a testator does not tend to show mental incapacity.

    [Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, § 92.]

Appeal from Trial Term, Rensselaer County.

Action by William J. Roche, individually and as executor of Henry T. Nason, deceased, against Paul Ford Nason and others. Certain defendants, heirs at law and next of kin of Henry T. Nason, deceased, appeal from a judgment upon the verdict of a jury, rendered by direction of the court, adjudging a certain writing, dated November 12, 1902, and a certain other writing, dated March 28, 1903, as together constituting the last will and testament of said Henry T. Nason, deceased, and enjoining all parties to the action from bringing or maintaining any action or proceeding, or from interposing or maintaining a defense in any action or proceeding, based upon a claim that the said writings are not the last will and testament of said deceased. Affirmed.

The deceased on the 12th day of November, 1902, signed and duly executed an instrument purporting to be his last will, by which he devised and bequeathed all of his property to his mother, · providing she should be alive at the time of his decease. In case his mother should not be alive at the

*P*

time of his decease, he gave and bequeathed to Isabella K. Lombard, a relative, and who was and for a long time had been the housekeeper in his mother's family, $10,000; to Dr. E. D. Ferguson, for many years the family physician, $10,000; to William J. Roche, his former law partner, and for more than 30 years associated with decedent's grandfather, $5,000; to Michael A. Tierney, his clerk, $5,000; to Mary Toohey, a servant in the family, $2,500; to Margaret Murphy, a servant in the family, $2,500; to Mary Ann Condon, a servant in the family, $2,500; and to the Samaritan Hospital in Troy, N. Y., $10,000. He expressly provided that the gift to the Samaritan Hospital was for the purpose of an endowment fund to be used for maintaining a room in said hospital, and which fund should be known as the "Nason Free Bed Fund," and which room should be known as the "Nason Room," and therein further provided as to said room and fund: "Wherein worthy poor persons may in case of sickness or accident receive treatment, nursing, food and attendance free of charge. The religious corporation known as the First Presbyterian Church of the City of Troy, acting through its officers or societies who care for the sick and poor, shall have the first right and privilege to have such room occupied by and such care and treatment given therein to any poor, sick, or injured person, whom such religious corporation may from time to time select and send to such hospital; and in the event that said religious corporation shall at any time be not using such room for such purpose, then the religious corporation known as the Second Street Presbyterian Church whose place of worship is on Second Street in the city of Troy shall have the like right and privilege." He further provided that the gift of $10,000 to said hospital was to be paid to said hospital corporation, providing it should execute in writing and deliver to his executor an agreement that the hospital corporation would accept the same as such endowment fund, and that the room should be maintained out of the income from said fund, and in the manner and for the purposes stated; otherwise the bequest was to lapse. In case of the death of his mother prior to his death, the balance of his property, after payment of the legacies as stated, was given to his grandfather Martin I. Townsend. In case neither his mother nor grandfather should survive him, he gave to Isabella K. Lombard, $25,000; Dr. E. D. Ferguson, $25,000; William J. Roche, $10,000; Michael A. Tierney, $5,000; Samaritan Hospital, $10,000 for endowment as stated; Mary Toohey, $2,500; Margaret Murphy, $2,500; Mary Ann Condon, $2,500; and the rest and remainder of his estate to said Samaritan Hospital. He also provided that the legacies to Dr. Ferguson and William J. Roche should not lapse in case of their death before his death, but that the same should be payable to their respective heirs at law and legal representatives. He appointed his mother sole executrix of his will, but provided that in case of her dying before his death said William J. Roche should be the sole executor thereof.

On the 28th day of March, 1903, deceased signed and duly executed a paper purporting to be a codicil to his said will, in no way changing the will other than by giving certain personal effects and property to persons and corporations named as follows: To the Woman's Association of Troy, an oil portrait of his mother. To the Troy Young Men's Association, all the books constituting the library at his residence; and he therein provided that said books should be given to said association on condition that they should be kept together and known as the "Townsend-Nason Library," and that there should be placed on the inside of the cover of each book a printed slip containing the words "Townsend-Nason Gift." To William J. Roche, his law library and all of the books at his law office. To Justine Kellogg, of Troy, two oil portraits of his mother—one in her childhood and the other in her girlhood—also all the Townsend family portraits, with a request to him that he should give such of them as he might choose to dispose of to such persons of the Townsend name or blood as he might think would be pleased to receive them. To said Justine Kellogg all his silverware, plate, crockery, bric-a-brac, carpets, pictures, mirrors, linen, curtains, glassware, and household furniture and utensils, both useful and ornamental. To William Pfeil, a barber, a shaving cup which belonged to his grandfather Martin I. Townsend, and on which his picture is burned.

Six days thereafter the deceased was found dead in a secluded place near the city of Albany, under circumstances that indicated that he had committed suicide.

The will and codicil were admitted to probate by the Surrogate's Court of the county of Rensselaer on the 2d day of July, 1903. This action was commenced on the 14th day of December, 1903, under section 2653A, of the Code of Civil Procedure, to cause the validity or invalidity of the probate of said instruments as the last will and testament of the deceased to be determined. The appellants defended said action on the grounds, among others, (1) that said instruments are not the last will and testament of the deceased; (2) that the decedent was not on November 12, 1902, nor on March 30, 1903, of sound mind and memory, and mentally capable of making a will; (3) that neither the execution of said will, nor the codicil thereto, was the free and voluntary act of said deceased; (4) that said will and the codicil thereto were executed as a component part of a suicidal mania and design by the decedent to take his own life, and they and each of them are wholly void; (5) that the instruments admitted to probate as the last will and testament of the deceased were not identified as the ones signed by the deceased, nor as one each of duplicates so signed by him, and that they are not, nor is either of them, the authentic and genuine instruments or instrument, or duplicates of instruments, signed by the deceased.

At the close of the testimony the court directed the jury to find a verdict "that the will of November 12, 1902, and the codicil executed March 28, 1903, were, and each of them was and is, in truth and fact, the last will and testament of Henry T. Nason, deceased."

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Jeremiah K. Long, for adult appellants.

Andrew P. McKean, guardian ad litem and attorney in person for infant appellant.

Edward W. Douglass, for respondent Roche.

William H. Van Schoonhoven (Edgar L. Fursman, of counsel), for Samaritan Hospital.

CHASE, J. "All persons except idiots, persons of unsound mind and infants may devise their real estate by a last will and testament duly executed. * * *" Rev. St. pt. 2, c. 6, tit. 1, § 1, as amended by chapter 782, p. 1926, Laws 1867. "Every male person of the age of eighteen years or upwards * * * of sound mind and memory, and no others, may give and bequeath his * * * personal estate by will in writing." Rev. St. pt. 2, c. 6, tit. 1, § 21, as amended by chapter 782, p. 1927, Laws 1867. "Before admitting a will to probate the surrogate must inquire particularly into all the facts and circumstances and must be satisfied of the genuineness of the will and the validity of its execution. * * *" Code Civ. Proc. § 2622.

The courts have frequently defined what constitutes a person of sound mind, within the meaning of the statutes relating to making a will, and we quote from Delafield v. Parish, 25 N. Y. 9:

"We have held that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were or should or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and

to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the statute of wills, a person of sound mind and memory, and is competent to dispose of his estate by will."

In Horn v. Pullman, 72 N. Y. 269, the court, in speaking of incapacity, say it cannot be "inferred from an enfeebled condition of mind or body," and further say:

"Such a rule would be dangerous in the extreme, and the law wisely sustains testamentary dispositions made by persons of impaired mental and bodily powers, provided the will is the free act of the testator, and he has sufficient intelligence to comprehend the condition of his property, and the scope, meaning, and effect of the provisions of the will."

In the later case of Dobie v. Armstrong, 160 N. Y. 584, 55 N. E. 302, the court say:

"A man's testamentary disposition of his property is not invalidated because its provisions are unequal or unjust, or the result of passion or of other unworthy or unjustifiable sentiments. It is natural, and therefore usual, to make provision for a child; but, under our governmental institutions, no obligation to do so is imposed upon the parent, and the presumption of validity is not affected by the failure to do so, alone. Nor is the presumption in favor of a will overcome by showing that the testator was of advanced age or of enfeebled condition of mind or body. That the testator may have received some unjustifiable impression, which had actuated him in making his will, does not warrant us in calling it a delusion. A man may even have an insane delusion, and yet be able to make a valid will, for the will, to be invalid, must be the result itself of the delusion, and it is not a delusion which incapacitates if the proof of its existence depends upon external and observable facts, giving rise to impressions which upon investigation might be proved to be unjust."

The testator was unmarried, and at the time of his death was in his thirty-eighth year. He was the only child of parents of more than ordinary mental strength. Many of his ancestors were distinguished, and most of them had lived to extreme old age. He was a grandson of Martin I. Townsend, a lawyer and speaker of national fame. His mother was a social and educational leader of great strength of mind, and his father was known in educational circles throughout the country, but died at the age of 63; having for a few years before his death been afflicted with a mental trouble that we understand is conceded to have been epileptic. The testator was a cultured and highly educated gentleman. He was fastidious in his dress, and quiet, gentle, and agreeable in manner. He had traveled extensively at home and abroad. He was admitted to the bar in the year 1888, and became a member of the firm of Townsend, Roche & Nason, consisting of his grandfather Mr. Roche, the executor named in his will, and himself. In the fall of 1896 he was elected county judge of the county of Rensselaer, which prevented him from further practicing his profession. His father died in 1895, and thereafter the testator lived with his mother and grandfather in the Nason homestead at Troy. In April, 1902, he was nervous from loss of sleep, and on the 16th day of April, 1902, went to a sanitarium for nervous diseases, and was accompanied by his mother. The April trial term of the county court of

Rensselaer county was held by a county judge from an adjoining county. He remained at such sanitarium until July 25, 1902. His mother remained with him until June 15, 1902, when she returned. On his return he continued in the performance of the duties of his office, holding the September trial term of the county court, which lasted about two weeks, and at which trial and grand jurors were in attendance, and also at which both criminal and civil cases were tried. During that fall he was renominated for county judge, to succeed himself, and attended to the duties arising by reason of the canvass for his election, and also to the duties of his office, including the hearing and decision of matters growing out of cases under the election and registration laws, and the hearing of applications for naturalization of foreign-born citizens. He was re-elected at the general election held early in November. His mother became ill in October, but the illness was not considered serious. On the 12th day of November the will was executed. Of the three witnesses to the will, one was the editor and proprietor of a Troy daily paper, who had long been an intimate friend of his, one was the stenographer of the county court, who had been such stenographer for many years, and the third was a young lady then in the household, attending his mother as a trained nurse. He personally saw the witnesses, and asked them to attend at his house as a witness to a paper, and when they gathered at his mother's home there were present besides the witnesses his grandfather and Mr. Roche. He had the possession of duplicate wills, and took them in the presence of the witnesses, and with his pen inserted the day of the month, and attention was called to an interlineation opposite which he had placed his initials. He then signed the papers in duplicate, and declared them to be his last will and testament, and requested the witnesses, by name, to sign them as witnesses to his will, and they did sign in the presence of the testator and in the presence of each other. In asking the young lady to act as one of the witnesses, he said to her that it was because there was no one in the house excepting herself that was not remembered in the will. At the time the will was executed his grandfather was in good health, and the illness of his mother was not considered serious. Six days thereafter the trial term of the county court of Rensselaer county again convened, at which there was in attendance a trial and grand jury. Testator presided at this term of court. The term lasted about two weeks, and both criminal and civil cases were tried in the ordinary way. On December 7th his mother died, having a few hours before had a hemorrhage of the brain. The testator continued nervous and suffered from lack of sleep, and prior to January 1, 1903, he went to Washington for a week, and soon thereafter he went to Florida with his clerk, and remained there for about a month, and he again returned to Rensselaer county, and continued in the performance of his official duties. His grandfather died on the 8th day of March, 1903. On March 28th he requested two of the persons who had witnessed his will—the editor and stenographer—to attend at his house and witness another

paper. When they met at his house he stated that he desired to execute a codicil to his will in duplicate. There were present at the time the witnesses and Mr. Roche, the executor. He produced duplicates from a desk, and they were duly signed and executed. On Monday thereafter, between 11 and 12 o'clock, while at his office, he told his clerk that he might take his lunch at Albany with a friend (naming him), and he further said that he probably would not be home for dinner. He then left his office, and was subsequently found dead, as already stated.

All of the testator's heirs at law and next of kin were collateral relatives, the nearest being second cousins. Most of them lived in other states, and it does not appear that he ever saw or communicated with the majority of them. All of his relatives were in good financial circumstances, and none of them had ever been dependent upon the testator, or, so far as appears, been assisted by him in any way in his lifetime. The legacies given in his will are to persons that had been faithful in his service or in the service of his parents, or to persons with whom he had been in intimate association or active business during his life. The residuary legatee is a charitable institution, of which his mother was one of the founders, and in which she was greatly interested, and by the legacy to it he perpetuated his name.

The will is not a strange or unnatural one. It was executed in the presence of his grandfather, and at a time and place and under circumstances which make it reasonably certain that the provisions were known to, and met with the approval of, both his mother and grandfather. The codicil only relates to personal effects, and, while important from a sentimental standpoint, it is of minor consequence, as it does not affect the general provisions of the will. No question has been raised, but that both the will and codicil were executed as provided by statute, and there has not been a suggestion by any one of the many people who were associated with the testator socially, politically, or officially, that he ever did or said an irrational thing, or that he was not sound, competent, and capable. The witnesses to the will, other than the nurse, and the witnesses to the codicil, had known him intimately all his life, and testified that he was of sound mind and memory, and not under any restraint at the time that the instruments severally were signed, and no one was produced to testify to the contrary. The fact of suicide alone is not sufficient to overcome the presumption of sanity. Shipman v. Protected Home Circle, 174 N. Y. 398, 67 N. E. 83, 63 L. R. A. 347; Weed v. Mutual Benefit Life Ins. Co., 70 N. Y. 561. Under the circumstances disclosed, we conclude that it affirmatively appears that the execution of the will and codicil were each the deliberate, intentional, and intelligent act of the testator. Both of the instruments were executed in duplicate, and they were all produced before the surrogate, when one of each was probated as the last will and testament of the testator; and the witnesses testified that they were duplicates, and the papers signed and executed by the testator as duplicates

of his will and codicil, respectively. See Redfield's Law & Practice of Surrogates' Court (5th Ed.) 129; Crossman v. Crossman, 95 N. Y. 145. It is true that the witnesses to the will and codicil did not actually read the instruments before they were executed, and could not testify as to their contents when executed, or as to their being the same, clause by clause, as when executed, by having actually compared them; but they could and did identify the instruments produced as the ones declared by the testator to be duplicates, and signed by him and them as such. The statutes of this state do not require that the witnesses to a will shall know the contents thereof, and be able to testify on the probate of the will that the provisions thereof as then appearing in the instrument are the same as in the instrument at the time when executed. Matter of Sheldon's Will (Surr.) 16 N. Y. Supp. 454. Our statutes do require that a will shall be subscribed at the end thereof, and the court should be alert to prevent a fraud being committed by changing the provisions of a will, or the sheets of paper making up a will, after the same is executed. It would be wholly impracticable to require witnesses to know and remember the contents of wills signed by them. The will in this case consisted of four pages of typewritten matter fastened together, and, although the fastening was not sufficiently secure to prevent the possibility of fraud by changing the sheets of which it consists, the presumption, where sheets of paper are bound together, constituting a will, at the testator's death, is that the same sheets were so bound together at the time of its execution. American & Eng. Ency. of Law (2d Ed.) vol. 30, p. 603. And there is not the slightest evidence in this case to overcome such presumption. The will and codicil are continuous in their provisions. They are each signed at the end thereof by the testator, and then follows the attestation clause, which was read aloud to and signed by the witnesses, and on one of the other three pages of the will are the initials of the testator where an interlineation was made. There is not a suspicious circumstance or fact affecting the execution or production of the wills or the codicils, but the instruments bear every indication of being the same at the time of probate that they were when signed by the testator and his witnesses. Far from there being any evidence of undue influence affecting testator's independent action, it does not appear that any one ever spoke to him about the disposition of his property, or in regard to making a will or codicil.

So far, we have considered this case on the assumption that the proponent of the will before the surrogate, and the plaintiff in this action, is bound to establish affirmatively the genuineness of the will and the validity of its execution. It was necessary, as we have seen, to satisfy the surrogate of its genuineness and validity; and, with duplicate wills before him, he was satisfied of their genuineness and validity, and the two papers—will and codicil—were admitted to probate by him as the last will and testament of the testator. In an action under section 2653a of the Code of Civil

Procedure, the Court of Appeals, in Dobie v. Armstrong, supra, in referring to the record in that case, say:

"Ordinarily the burden of proof is upon the party propounding a will, but section 2653a of the Code of Civil Procedure, which is the authority for the maintenance of this action, places the burden upon the defendants, who contest the validity of the will, of establishing the testamentary incapacity of the testator. The probate of the will by the surrogate is made prima facie evidence of its due execution and validity. The affirmative was with this appellant upon the question of the case—whether a delusion or an insane belief existed in the testator's mind with respect to his domestic relations, and especially with respect to his son, which incapacitated him from validly willing away his estate. The burden was upon him to adduce evidence which would be sufficient to uphold a verdict that the testator was the victim of such a delusion with respect to his son as to prevent his affections from operating in their natural channel. He assumed the burden of showing that there was no cause for his father's changed feelings in facts or in actual circumstances, and therefore that they could only have had their origin in some figment of the brain."

The trial court refused to allow the wife of one of testator's next of kin, and a party to the action, to testify concerning personal transactions and communications with the testator. Testator left real estate, which, except for the will, would descend to his heirs at law; and the witness, as the wife of an heir at law, would have an inchoate right of dower therein, and her evidence was properly excluded. Eckert v. Eckert, 13 App. Div. 490, 43 N. Y. Supp. 353.

The trial court also refused to allow a witness to testify to what he had heard in the family as to the insanity of certain of testator's ancestors. The ruling was in accordance with the decision in People v. Koerner, 154 N. Y. 355, 48 N. E. 730. See Pringle v. Burroughs, 100 App. Div. 366, 91 N. Y. Supp. 750.

The trial court also refused to allow proof of statements made by the testator's mother to a physician at the sanitarium, and also to allow in evidence certain letters written by the testator's mother while she was at the sanitarium with the testator. Such statements and the contents of such letters were clearly hearsay.

If we assume that the testator contemplated suicide when he executed the codicil to his will, or even when he executed the will of November 12, 1902, we cannot assent to the claim of the appellants that such instruments are void. as against public policy. Unlike the beneficiary in the case of Riggs v. Palmer, 115 N. Y. 506, 22 N. E. 188, 5 L. R. A. 340, 12 Am. St. Rep. 819, the persons and corporations who are benefited by the provisions of the testator's will have done no wrong. In that case the majority of the court say that a person who murders a testator for the express purpose of preventing him from changing his will, which then existed in his favor, and to obtain immediate possession of the property devised and bequeathed to him, shall not receive the property, which would be a reward for the commission of a crime. This decision was said to be dictated by public policy, and to be based on the fundamental maxims of the common law, therein stated to be, "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own

iniquity, or to acquire property by his own crime." No principle of public policy requires that the property devised and bequeathed by a person who subsequently commits suicide shall be taken from innocent beneficiaries, and presented to other persons, who would take the same contrary to the express direction of a competent testator. The decision in Riggs v. Palmer, supra, should not be extended to prohibit a person otherwise competent from making a will, if he then contemplated the possibility or probability of suicide. If there is any reason for such a prohibition, it should be expressed by the Legislature.

The trial court refused to allow the physician in charge of the sanitarium to answer questions put to him by the appellants as to testator's physical and mental condition when he arrived at the sanitarium, and as to what treatment was given to him, and also as to conversations had with him in regard to his religious belief; and the court also refused to allow Dr. Ferguson to answer a question put to him as to what the testator said to him concerning his health. All of these questions were objected to as being prohibited by section 834 of the Code of Civil Procedure. The appellants on the trial expressly waived the provisions of said section 834 so far as the physician from the sanitarium was concerned, and contended before the trial court and contend here that the prohibition of section 834 of the Code of Civil Procedure was thereby obviated as provided by section 836 of the Code of Civil Procedure.

It seems unnecessary for this court to discuss the questions involved by the contention of the parties, for the reason that we are of the opinion that the answers to the questions propounded could not have been such as to have required the submission of the question of the testator's mental capacity to the jury. The questions which relate principally to testator's physical condition could not affect the result in this case, for, as we have seen, an enfeebled condition of body does not of itself affect one's testamentary capacity; and the questions, so far as they relate to the testator's opinion of his own health or as to his religious belief, have no connection with the will, or with the disposition made of his property. So far as the questions related generally to his mental condition while at the sanitarium, the answers thereto could not affect or destroy the uncontradicted evidence as to testator's intelligence and competency when the instruments were executed, as shown by the record.

The judgment should be affirmed, with costs. All concur.