Philo Riggs, as Guardian ad litem et al., Appellants, *v.* Elmer E. Palmer et al., Respondents.

It was not the intention of the legislature, in the general laws passed for the devolution of property by will or descent, that they should, and they do not, operate in favor of one who murdered his ancestor or benefactor in order to speedily come into possession of his estate either as devisee, legatee or heir-at-law. (Danforth and Gray, JJ., dissenting.)

Where, therefore, a beneficiary under a will, in order that he might prevent revocation of the provision in his favor and to obtain the speedy enjoyment and possession of the property, willfully murdered the testator, *held* (Danforth and Gray, JJ., dissenting), that such beneficiary, by reason of the crime committed by him, was deprived of any interest in the estate left by his victim, and so was not entitled to the property either as donee under the will or as heir or next of kin; and that an action was maintainable to cancel said provisions.

All laws, as well as all contracts, may be controlled in their operation and effect by these general fundamental maxims of the common law, viz.: No one shall be permitted to profit by his own fraud, to take advantage of his own wrong, to found any claim upon his own inequity or to acquire property by his own crime.

*Owens* v. *Owens* (100 N. C. 240) disapproved.

A thing which is within the letter of a statute is not within the statute unless it is within the intention of the law-makers.

(Submitted June 21, 1889; decided October 8, 1889.)

Appeal from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made February 5, 1887, which affirmed a judgment dismissing the complaint entered upon the report of a referee.

This action was brought to have the will of Francis B. Palmer, deceased, so far as it devises and bequeaths property to Elmer E. Palmer, canceled and annulled.

The facts are sufficiently stated in the opinion.

*Leslie W. Russell* and *C. E. Sanford* for appellants. The right of Francis B. Palmer to make another will was a sacred one, entitled to the protection of the law, and he had the same right to enjoy his property until death. Elmer E. Palmer violated both of these rights, which are civil rights, independently of crim-

inal punishment. (Broom's Leg. Max. 275 ; Co. on Litt. 148 b ; *Rice* v. *Munley*, 66 N. Y. 82 ; *M. L. Ins. Co.* v. *Armstrong*, 117 U. S. 591, 600.) No court will lend its aid to a man who founds his cause of action upon a fraudulent or illegal act) (*Holman* v. *Johnson*, Cowp. 343.) The courts favor a decision which upholds common decency and common morals, and violates no rule of law or equity. (*Piper* v. *Hoard*, 107 N. Y. 82.) Wherever a moral question was involved in the application of civil rights, the civil law, whether announced in the institutes, codes and pandects, or whether it rested simply in the application of unwritten law, was founded, so far as the courts could take cognizance of human action, on *fas jus, et boni mores*. (Justinian Legislation.) If a beneficiary attempts the life of the testator, he cannot take under the testament. (1 Domat's Civ. Law, pt. 2, tit. 1, § 3 ; 2 Cush. [ed. 1850] 78, 84 ; Pothier on Successions, chap. 1, § 2, art. 4 ; 4 Toullier, 113, 114 ; 4 Duranton, 111 ; 3 Marcade, 42 ; Code Napoleon, art. 727 ; Spanish Partidas, 994 ; Louisiana Code, 1560, 1710.) The claim can be sustained upon the ground that Elmer Palmer is estopped by his own conduct from claiming the title to this property, or that the condition upon which he takes has, in contemplation of law, happened. (Bigelow on Estop. 370 ; Herman on Estop. §§ 731, 733–735, 740, 743, 991 ; 2 Story's Eq. Jur. §§ 1533, 1544 ; *Caulfield* v. *Sullivan*, 85 N. Y. 153 ; *Chamberlain* v. *Chamberlain*, 43 id. 425, 442 ; *Leonard* v. *Crommelin*, 1 Edw. Ch. 206 ; *Shivers* v. *Goar*, 40 Ga. 676 ; *Cox* v. *Rogers*, 77 Penn. St. 160.) It will not be construed, no matter what the language, that the legislature intended to allow a public mischief or wrong. (*Smith* v. *People*, 47 N. Y. 330, 337 ; Code of Civ. Pro. 866 ; *Anderson* v. *Anderson*, 19 N. E. Rep. 427 ; 112 N. Y. 104 ; Broom's Leg. Max. 19, 20 ; Finch's Law, 75, 76 ; Noy, Max. [9th ed.] 2 ; Doct. and Stud. [18th ed.] 15, 16.)

*W. M. Hawkins* for respondents. Where a legatee, by improper means, prevents the testator from making proposed changes in his will, this prevention cannot operate to invalidate

the will. (*Leaycraft* v. *Simmons*, 3 Bradf. 35 ; 12 Am. Dec.
375.) It does not lie with the court to enhance the pains,
penalties and forfeitures provided by law for the punishment
of crime, nor can it add any disability to those pains and penal-
ties not expressly declared by the Constitution or laws. (*Peo-
ple* v. *Thurston*, 25 Hun, 456–468 ; 2 Keyes, 294.) When a
case is new in principle, it is necessary to have recourse to
legislative interposition to remedy the grievance; but when
the question is new in instance, and the only question is upon
the application of a principle recognized in law, can the
courts act? (Broom's Leg. Max. [4th ed.] 154 ; Civ. Code of
Canada, 95, 142; South–East. Rep. 794; *Owens* v. *Owens*,
100 N. C. 240.) Since the repeal of the act of 1799 by the
Revised Statutes it cannot be successfully urged that Elmer E.
Palmer is civilly dead. (6 Johns. Ch. 118 ; 21 Alb. L. Jour.
268; 38 id. 394.)

EARL, J. On the 13th day of August 1880, Francis B.
Palmer made his last will and testament, in which he gave
small legacies to his two daughters, Mrs. Riggs and Mrs. Pres-
ton, the plaintiffs in this action, and the remainder of his estate
to his grandson, the defendant, Elmer E. Palmer, subject to
the support of Susan Palmer, his mother, with a gift over to
the two daughters, subject to the support of Mrs. Palmer, in
case Elmer should survive him and die under age, unmarried
and without any issue. The testator at the date of his will
owned a farm and considerable personal property. He was a
widower, and thereafter, in March 1882, he was married to
Mrs. Bresee, with whom before his marriage he entered into
an ante-nuptial contract in which it was agreed that, in lieu of
dower and all other claims upon his estate in case she survived
him, she should have her support upon his farm during her
life, and such support was expressly charged upon the farm.
At the date of the will, and, subsequently, to the death of the
testator, Elmer lived with him as a member of his family, and
at his death was sixteen years old. He knew of the provisions
made in his favor in the will, and, that he might prevent his

grandfather from revoking such provisions, which he had manifested some intention to do, and to obtain the speedy enjoyment and immediate possession of his property, he willfully murdered him by poisoning him. He now claims the property, and the sole question for our determination is, can he have it? The defendants say that the testator is dead; that his will was made in due form and has been admitted to probate, and that, therefore, it must have effect according to the letter of the law.

It is quite true that statutes regulating the making, proof and effect of wills, and the devolution of property, if literally construed, and if their force and effect can in no way and under no circumstances be controlled or modified, give this property to the murderer.

The purpose of those statutes was to enable testators to dispose of their estates to the objects of their bounty at death, and to carry into effect their final wishes legally expressed; and in considering and giving effect to them this purpose must be kept in view. It was the intention of the law-makers that the donees in a will should have the property given to them. But it never could have been their intention that a donee who murdered the testator to make the will operative should have any benefit under it. If such a case had been present to their minds, and it had been supposed necessary to make some provision of law to meet it, it cannot be doubted that they would have provided for it. It is a familiar canon of construction that a thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute, unless it be within the intention of the makers. The writers of laws do not always express their intention perfectly, but either exceed it or fall short of it, so that judges are to collect it from probable or rational conjectures only, and this is called rational interpretation; and Rutherforth, in his Institutes (p. 407), says: " When we make use of rational interpretation, sometimes we restrain the meaning of the writer so as to take in less, and sometimes

we extend or enlarge his meaning so as to take in more than his words express."

Such a construction ought to be put upon a statute as will best answer the intention which the makers had in view, for *qui haeret in litera, haeret in cortice.* In Bacon's Abridgment (Statutes I, 5); Puffendorf (book 5, chapter 12), Rutherforth (pp. 422, 427), and in Smith's Commentaries (814), many cases are mentioned where it was held that matters embraced in the general words of statutes, nevertheless, were not within the statutes, because it could not have been the intention of the law-makers that they should be included. They were taken out of the statutes by an equitable construction, and it is said in Bacon: "By an equitable construction, a case not within the letter of the statute is sometimes holden to be within the meaning, because it is within the mischief for which a remedy is provided. The reason for such construction is that the law-makers could not set down every case in. express terms. In order to form a right judgment whether a case be within the equity of a statute, it is a good way to suppose the law-maker present, and that you have asked him this question, did you intend to comprehend this case ? Then you must give yourself such answer as you imagine he, being an upright and reasonable man, would have given. If this be that he did mean to comprehend it, you may safely hold the case to be within the equity of the statute; for while you do no more than he would have done, you do not act contrary to the statute, but in conformity thereto." In some cases the letter of a legislative act is restrained by an equitable construction; in others it is enlarged; in others the construction is contrary to the letter. The equitable construction which restrains the letter of a statute is defined by Aristotle, as frequently quoted, in this manner : *Aequitas est correctio legis generaliter latae qua parti deficit.* If the law-makers could, as to this case, be consulted, would they say that they intended by their general language that the property of a testator or of an ancestor should pass to one who had taken his life for the express purpose of getting his property ? In 1 Black-

stone's Commentaries (91) the learned author, speaking of the construction of statutes, says: "If there arise out of them any absurd consequences manifestly contradictory to common reason, they are, with regard to those collateral consequences, void. * * * When some collateral matter arises out of the general words, and happen to be unreasonable, then the judges are in decency to conclude that the consequence was not foreseen by the parliament, and, therefore, they are at liberty to expound the statute by equity and only *quoad hoc* disregard it; " and he gives as an illustration, if an act of parliament gives a man power to try all causes that arise within his manor of Dale, yet, if a cause should arise in which he himself is party, the act is construed not to extend to that because it is unreasonable that any man should determine his own quarrel.

There was a statute in Bologna that whoever drew blood in the streets should be severely punished, and yet it was held not to apply to the case of a barber who opened a vein in the street. It is commanded in the Decalogue that no work shall be done upon the Sabbath, and yet, giving the command a rational interpretation founded upon its design, the Infallible Judge held that it did not prohibit works of necessity, charity or benevolence on that day.

What could be more unreasonable than to suppose that it was the legislative intention in the general laws passed for the orderly, peaceable and just devolution of property, that they should have operation in favor of one who murdered his ancestor that he might speedily come into the possession of his estate? Such an intention is inconceivable. We need not, therefore, be much troubled by the general language contained in the laws.

Besides, all laws as well as all contracts may be controlled in their operation and effect by general, fundamental maxims of the common law. No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered

in all civilized countries, and have nowhere been superseded by statutes. They were applied in the decision of the case of the *New York Mutual Life Insurance Company* v. *Armstrong* (117 U. S. 591). There it was held that the person who procured a policy upon the life of another, payable at his death, and then murdered the assured to make the policy payable, could not recover thereon. Mr. Justice FIELD, writing the opinion, said : " Independently of any proof of the motives of Hunter in obtaining the policy, and even assuming that they were just and proper, he forfeited all rights under it when, to secure its immediate payment, he murdered the assured. It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had willfully fired."

These maxims, without any statute giving them force or operation, frequently control the effect and nullify the language of wills. A will procured by fraud and deception, like any other instrument, may be decreed void and set aside, and so a particular portion of a will may be excluded from probate or held inoperative if induced by the fraud or undue influence of the person in whose favor it is. (*Allen* v. *M'Pherson*, 1 H. L. Cas. 191; *Harrison's Appeal*, 48 Conn. 202.) So a will may contain provisions which are immoral, irreligious or against public policy, and they will be held void.

Here there was no certainty that this murderer would survive the testator, or that the testator would not change his will, and there was no certainty that he would get this property if nature was allowed to take its course. He, therefore, murdered the testator expressly to vest himself with an estate. Under such circumstances, what law, human or divine, will allow him to take the estate and enjoy the fruits of his crime ? The will spoke and became operative at the death of the testator. He caused that death, and thus by his crime made it speak and have operation. Shall it speak and operate in his favor ? If he had met the testator and taken his property by

force, he would have had no title to it. Shall he acquire title by murdering him? If he had gone to the testator's house and by force compelled him, or by fraud or undue influence had induced him to will him his property, the law would not allow him to hold it. But can he give effect and operation to a will by murder, and yet take the property? To answer these questions in the affirmative, it seems to me, would be a reproach to the jurisprudence of our state, and an offense against public policy.

Under the civil law evolved from the general principles of natural law and justice by many generations of jurisconsults, philosophers and statesmen, one cannot take property by inheritance or will from an ancestor or benefactor whom he has murdered. (Domat, part 2, book 1, tit. 1, § 3; Code Napoleon, § 727; Mackeldy's Roman Law, 530, 550.) In the Civil Code of Lower Canada the provisions on the subject in the Code Napoleon have been substantially copied. But, so far as I can find, in no country where the common law prevails has it been deemed important to enact a law to provide for such a case. Our revisers and law-makers were familiar with the civil law, and they did not deem it important to incorporate into our statutes its provisions upon this subject. This is not a *casus omissus*. It was evidently supposed that the maxims of the common law were sufficient to regulate such a case and that a specific enactment for that purpose was not needed.

For the same reasons the defendant Palmer cannot take any of this property as heir. Just before the murder he was not an heir, and it was not certain that he ever would be. He might have died before his grandfather, or might have been disinherited by him. He made himself an heir by the murder, and he seeks to take property as the fruit of his crime. What has before been said as to him as legatee applies to him with equal force as an heir. He cannot vest himself with title by crime.

My view of this case does not inflict upon Elmer any

greater or other punishment for his crime than the law speci-
fies.  It takes from him no property, but simply holds that he
shall not acquire property by his crime, and thus be rewarded
for its commission.

Our attention is called to *Owens* v. *Owens* (100 N. C. 240),
as a case quite like this.  There a wife had been con-
victed of being an accessory before the fact to the murder
of her husband, and it was held that she was, nevertheless,
entitled to dower.  I am unwilling to assent to the doctrine
of that case.  The statutes provide dower for a wife who has
the misfortune to survive her husband and thus lose his sup-
port and protection.  It is clear beyond their purpose to make
provision for a wife who by her own crime makes herself a
widow and willfully and intentionally deprives herself of the
support and protection of her husband.  As she might have
died before him, and thus never have been his widow, she can-
not by her crime vest herself with an estate.  The principle
which lies at the bottom of the maxim, *volenti non fit injuria*,
should be applied to such a case, and a widow should not, for
the purpose of acquiring, as such, property rights, be per-
mitted to allege a widowhood which she has wickedly and
intentionally created.

The facts found entitled the plaintiffs to the relief they
seek.  ·The error of the referee was in his conclusion of law.
Instead of granting a new trial, therefore, I think the proper
judgment upon the · facts found should be ordered here.
The facts have been passed upon twice with the same result,
first upon the trial of Palmer for murder, and then by the ref-
eree in this action.  We are, therefore, of opinion that the
ends of justice do not require that they should again come in
question.

The judgment of the General Term and that entered upon
the report of the referee should, therefore, be reversed and
judgment should be entered as follows : That Elmer E. Palmer
and the administrator be enjoined from using any of the per-
sonalty or real estate left by the testator for Elmer's benefit;
that the devise and bequest in the will to Elmer be declared

ineffective to pass the title to him; that by reason of the crime of murder committed upon the grandfather he is deprived of any interest in the estate left by him; that the plaintiffs are the true owners of the real and personal estate left by the testator, subject to the charge in favor of Elmer's mother and the widow of the testator, under the ante-nuptial agreement, and that the plaintiffs have costs in all the courts against Elmer.

GRAY, J. (dissenting). This appeal presents an extraordinary state of facts, and the case, in respect of them, I believe, is without precedent in this state.

The respondent, a lad of sixteen years of age, being aware of the provisions in his grandfather's will, which constituted him the residuary legatee of the testator's estate, caused his death by poison in 1882. For this crime he was tried and was convicted of murder in the second degree, and at the time of the commencement of this action he was serving out his sentence in the state reformatory. This action was brought by two of the children of the testator for the purpose of having those provisions of the will in the respondent's favor canceled and annulled.

The appellants' argument for a reversal of the judgment, which dismissed their complaint, is that the respondent unlawfully prevented a revocation of the existing will, or a new will from being made, by his crime, and that he terminated the enjoyment by the testator of his property and effected his own succession to it by the same crime. They say that to permit the respondent to take the property willed to him would be to permit him to take advantage of his own wrong.

To sustain their position the appellants' counsel has submitted an able and elaborate brief, and, if I believed that the decision of the question could be affected by considerations of an equitable nature, I should not hesitate to assent to views which commend themselves to the conscience. But the matter does not lie within the domain of conscience. We are bound by the rigid rules of law, which have been established by the legislature, and within the limits of which the determ-

ination of this question is confined. The question we are dealing with is, whether a testamentary disposition can be altered, or a will revoked, after the testator's death, through an appeal to the courts, when the legislature has, by its enactments, prescribed exactly when and how wills may be made, altered and revoked, and, apparently, as it seems to me, when they have been fully complied with, has left no room for the exercise of an equitable jurisdiction by courts over such matters. Modern jurisprudence, in recognizing the right of the individual, under more or less restrictions, to dispose of his property after his death, subjects it to legislative control, both as to extent and as to mode of exercise. Complete freedom of testamentary disposition of one's property has not been and is not the universal rule; as we see from the provisions of the Napoleonic Code, from those systems of jurisprudence in other countries which are modeled upon the Roman law, and from the statutes of many of our states. To the statutory restraints, which are imposed upon the disposition of one's property by will, are added strict and systematic statutory rules for the execution, alteration and revocation of the will; which must be, at least, substantially, if not exactly, followed to insure validity and performance. The reason for the establishment of such rules, we may naturally assume, consists in the purpose to create those safeguards about these grave and important acts, which experience has demonstrated to be the wisest and surest. That freedom, which is permitted to be exercised in the testamentary disposition of one's estate by the laws of the state, is subject to its being exercised in conformity with the regulations of the statutes. The capacity and the power of the individual to dispose of his property after death, and the mode by which that power can be exercised, are matters of which the legislature has assumed the entire control, and has undertaken to regulate with comprehensive particularity.

The appellants' argument is not helped by reference to those rules of the civil law, or to those laws of other governments, by which the heir or legatee is excluded from benefit under the testament, if he has been convicted of killing, or

attempting to kill, the testator.     In the absence of such legis-
lation here, the courts are not empowered to institute such a
system of remedial justice.     The deprivation of the heir of
·his testamentary succession by the Roman law, when guilty
of such a crime, plainly, was intended to be in the nature of a
punishment imposed upon him.     The succession, in such a
case of guilt, escheated to the exchequer.     (See Domat's Civil
Law, pt. 2, book 1, tit. 1, § 3.)

I concede that rules of law, which annul testamentary pro-
vision made for the benefit of those who have become
unworthy of them, may be based on principles of equity and
of natural justice.     It is quite reasonable to suppose that a
testator would revoke or alter his will, where his mind has
been so angered and changed as to make him unwilling to have
his will executed as it stood.     But these principles only
suggest sufficient reasons for the enactment of laws to meet
such cases.

The statutes of this state have prescribed various ways in
which a will may be altered or revoked; but the very provi-
sion, defining the modes of alteration and revocation, implies
a prohibition of alteration or revocation in any other way.
The words of the section of the statute are: "No will in
writing, except in the cases hereinafter mentioned, nor any
part thereof, shall be revoked or altered otherwise," etc.
Where, therefore, none of the cases mentioned are met by the
facts, and the revocation is not in the way described in the
section, the will of the testator is unalterable.     I think that a
valid will must continue as a will always, unless revoked in
the manner provided by the statutes.     Mere intention to
revoke a will does not have the effect of revocation.     The
intention to revoke is necessary to constitute the effective
revocation of a will; but it must be demonstrated by one of
the acts contemplated by the statute.     As WOODWORTH, J.,
said in *Dan* v. *Brown* (4 Cow. 490): "Revocation is an act
of the mind, which must be demonstrated by some outward
and visible sign of revocation."     The same learned judge said
in that case: "The rule is that if the testator lets the will

stand until he dies, it is his will; if he does not suffer it to do
so, it is not his will." (*Goodright* v. *Glasier*, 4 Burr. 2512,
2514; *Pemberton* v. *Pemberton*, 13 Ves. 290.)

The finding of fact of the referee, that, presumably, the
testator would have altered his will, had he known of his grand-
son's murderous intent, cannot affect the question. We may
concede it to the fullest extent; but still the cardinal objec-
tion is undisposed of, that the making and the revocation of
a will are purely matters of statutory regulation, by which the
court is bound in the determination of questions relating to
these acts. Two cases in this state and in Kentucky, at an
early day, seem to me to be much in point. *Gains* v. *Gains*
(2 Marshall, 190), was decided by the Kentucky Court
of Appeals in 1820. It was there urged that the testator
intended to have destroyed his will, and that he was forcibly
prevented from doing so by the defendant in error or devisee,
and it was insisted that the will, though not expressly, was
thereby virtually revoked. The court held, as the act concern-
ing wills prescribed the manner in which a will might be
revoked, that as none of the acts evidencing revocation were
done, the intention could not be substituted for the act. In
that case the will was snatched away and forcibly retained.
In 1854, Surrogate BRADFORD, whose opinions are entitled to
the highest consideration, decided the case of *Leaycraft* v.
*Simmons* (3 Bradf. 35). In that case the testator, a man of
eighty-nine years of age, desired to make a codicil to his will,
in order to enlarge the provisions for his daughter. His son
having the custody of the instrument, and the one to be
prejudiced by the change, refused to produce the will, at
testator's request, for the purpose of alteration. The learned
surrogate refers to the provisions of the civil law for such
and other cases of unworthy conduct in the heir or legatee,
and says, "our statute has undertaken to prescribe the mode
in which wills can be revoked (citing the statutory provision).
This is the law by which I am governed in passing upon
questions touching the revocation of wills. The whole of this
subject is now regulated by statute, and a mere intention to

revoke, however well authenticated, or however defeated, is not sufficient." And he held that the will must be admitted to probate. I may refer also to a case in the Pennsylvania courts. In that state the statute prescribed the mode for repealing or altering a will, and in *Clingan* v. *Mitcheltree* (31 Pa. State Rep. 25) the Supreme Court of the state held, where a will was kept from destruction by the fraud and misrepresentation of the devisee, that to declare it canceled as against the fraudulent party would be to enlarge the statute

I cannot find any support for the argument that the respondent's succession to the property should be avoided because of his criminal act, when the laws are silent. Public policy does not demand it, for the demands of public policy are satisfied by the proper execution of the laws and the punishment of the crime. There has been no convention between the testator and his legatee, nor is there any such contractual element in such a disposition of property by a testator, as to impose or imply conditions in the legatee. The appellants' argument practically amounts to this: That as the legatee has been guilty of a crime, by the commission of which he is placed in a position to sooner receive the benefits of the testamentary provision, his rights to the property should be forfeited and he should be divested of his estate. To allow their argument to prevail would involve the diversion by the court of the testator's estate into the hands of persons, whom, possibly enough, for all we know, the testator might not have chosen or desired as its recipients. Practically the court is asked to make another will for the testator. The laws do not warrant this judicial action, and mere presumption would not be strong enough to sustain it.

But more than this, to concede appellants' views would involve the imposition of an additional punishment or penalty upon the respondent. What power or warrant have the courts to add to the respondent's penalties by depriving him of property? The law has punished him for his crime, and we may not say that it was an insufficient punishment. In the trial and punishment of the respondent the law has

vindicated itself for the outrage. which he committed, and further judicial utterance upon the subject of punishment or deprivation of rights is barred. We may not, in the language of the court in *People* v. *Thornton* (25 Hun, 456), "enhance the pains, penalties and forfeitures provided by law for the punishment of crime."

The judgment should be affirmed, with costs.

All concur with EARL, J., except GRAY, J., who reads dissenting opinion, and DANFORTH, J., concurring.

Judgment in accordance with the prevailing opinion.