John M. Keane, S.
Cora Lupka died October 29, 1965 from the effects of an assault committed by her husband, Stanley, earlier in the month. Shortly after the assault Stanley was committed to the Binghamton State Hospital as a mentally ill person. He is still there. A charge of assault in the first degree is still pending against him.
By her will admitted to probate in this court, Cora Lupka left one third of her property to her husband Stanley. Under the circumstances of her death, should he receive his share of her estate? The special guardian for Stanley answers in the affirmative but the special guardian for two infant residuary legatees answers in the negative.
The principle of law involved here appears in the leading case of Riggs v. Palmer (115 N. Y. 506, 511-512 [1889]) where the court states: “No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes.”
The special guardian for the infant residuary legatees in arguing against payment to decedent’s husband contends that the principle is still part of our law by citing relatively recent decisions such as Bierbrauer v. Moran (244 App. Div. 87 [1935]); Matter of Jacobs (2 A D 2d 774 [1956]); Matter of Sparks (172 Misc. 642 [1939]); Matter of Lonergan (63 N. Y. S. 2d 307 [1946]); Matter of Sengillo (206 Misc. 751 [1954]); Matter of Drewes (206 Misc. 940 [1954]) and Matter of Hawkins (213 N. Y. S. 2d 188 [1961]).
*678 Both special guardians point out that in all of the foregoing cases, no question is raised about insanity or inability to understand the consequences of one’s act. In Matter of Eckardt (184 Misc. 748 [1945]) there is an extensive review of the question where ability to understand is involved. In Eckardt (supra) the wife claimed that the homicide of her husband occurred while she was affected by somnambulism. With this factor in mind the court in permitting the wife to inherit from the husband said (p. 757): “ The decision here, however, will be upon the finding that the wife committed no legal wrong and that the principle barring one from profiting from his own wrong is inapplicable.”
Only last year the problem of a wrongdoer profiting from his wrong was the subject of a decision in Matter of Bobula (19 N Y 2d 818 [1967]). While flashbacks and rearrangement of time sequences often make an interesting cinema scenario, this court believes that clarity is enhanced if events are related as they happen. Since the Bobula decision is of utmost importance here, it will be critically analyzed.
John and Marian Bobula were found dead at home on August 28, 1964. Medical reports indicated that John Bobula murdered his wife and then committed suicide. After hearing the evidence, from which the exact time of each death could not be determined, the Erie County Surrogate on November 10, 1964 made an order that death occurred simultaneously. The significance of this will be commented on later.
Both John and Marian Bobula left wills. He left everything to a stepson. She gave John one third of her estate if he survived with a gift over to her daughter if he predeceased her. Subsequently there was a proceeding in Surrogate’s Court ‘ ‘ to determine the rights of inheritance and distribution of particular assets passing under either or both of the above estates.”
In his decision in 45 Misc 2d 745 (1965) at page 746 the Surrogate states: 11 The basic rule that a wrongdoer shall not profit by his own crime is accepted by all the parties and counsel in this proceeding. Such rule, of course, extends to the distributees or legatees of the wrongdoer. It is accordingly conceded by all interested parties that the estate of John Bobula, deceased, shall not share in any of the assets that belonged exclusively to Marian Bobula at the time of her death. No claim, therefore is made by the estate of John Bobula to those assets listed under numbers seven, eight, nine and ten of the agreement filed herein, and these particular assets shall be distributed in accordance with the will of Marian Bobula, deceased.”
*679 This language is quoted at length because it is the basis of an argument in this court by the special guardian for the infants that one rule applies to property exclusively owned by the decedent victim and another rule to that owned jointly by the decedent victim and the wrongdoer. It is the opinion of this court that the quoted language is dictum, unnecessary for the determination by the Surrogate. Keeping in mind that an order had been made that deaths were simultaneous, then under section 89 of the Decedent Estate Law (now EPTL 2-1.6) John Bobula could not inherit under the will of his wife. Thus with the finding of simultaneous death, it makes no difference that he murdered her.
After deciding that property in John’s name went under his will and that in Marian’s name under her will, a dispute remained as to three other items: (1) United States Savings Bonds jointly held; (2) a joint bank account and (3) a life insurance policy on John’s life payable to Marian.
The Surrogate decreed (1) that the Savings Bonds under applicable Treasury Regulations were payable to both estates equally; (2) the joint savings account under subdivision 3 of section 89 of the Decedent Estate Law (now EPTL 2-1.6, subd. [c]) was payable to both estates equally; and (3) the life insurance policy under subdivision 4 of section 89 of the Decedent Estate Law (now EPTL 2-1.6, subd. [d]) was payable to the estate of John Bobula.
The Appellate Division (25 A D 2d 241 [1966]) disagreed with the Surrogate on each item. Under their interpretation of the Treasury Regulations concerning jointly held Savings Bonds, the proceeds were payable to the wife’s estate because of her husband’s wrongdoing.
Relying on a decision in their own department (Bierbrauer v. Moran, supra), they gave the proceeds of the joint bank account to the wife’s estate because of the husband’s wrongdoing.
Finally on the life insurance proceeds, the matter was returned to the Surrogate for additional facts before a determination could be made.
Starting in Buffalo, continuing on to Rochester, the case completed its journey across the State to Albany where the Court of Appeals in 17 N Y 2d 864 (1966) first denied a motion to dismiss the appeal except as to the insurance policy. Finally, with only the question of the joint Savings Bonds and joint bank account before it, the court at 19 N Y 2d 818 (1967) remanded the matter to the Surrogate to determine whether the wrongdoer was insane. The court went on to say if he were *680 insane and could not have been successfully prosecuted for the homicide, then the property should be distributed as originally provided by the Surrogate.
How does all this extensive review of the Bobula estates relate to the matter before this court! Clearly the Court of Appeals has said if a wrongdoer is sufficiently insane so he could not be successfully prosecuted for his crime, he will not be deprived of his interest in jointly held property where he is entitled to half because of simultaneous death. Is its holding limited to jointly held property! The special guardian for the two infants so argues.
All of Cora Lupka’s property was in her own name. Her husband was mentally ill immediately after the assault and continues to be mentally ill. It is a reasonable conclusion that the condition existed at the time of the assault. It seems to this court that the holding of the Court of Appeals should not be narrowly limited to jointly held property.
Therefore, this court, following Matter of Eckardt (supra) determines that Stanley Lupka may inherit under the will of his wife, because of his mental condition at the time of the assault. Such a conclusion is consistent with those cases which would deny inheritance, because in none of them was there a question of the mental condition of the wrongdoer at the time of the wrongful act.