206

James A. Petrie, Jr., et al., Respondents, *v.* Chase Manhattan Bank et al., Respondents, et al., Defendants, and American Mental Health Foundation, Appellant.

First Department, February 3, 1972.

*Joel S. Stern* (*John A. Kiser* with him on the brief), attorney for appellant.

*J. Kenneth Campbell* of counsel (*Alexander & Green,* attorneys), for Chase Manhattan Bank and another, as trustees, respondents.

*Thomas B. Fenlon* of counsel (*Frank W. Cuiffo* with him on the brief; *Emmet, Marvin & Martin,* attorneys), for Ruth P. Gonynor, respondent.

Steuer, J. This action was begun by the executors of the estate of John R. Larendon, deceased, to set aside an irrevocable *inter vivos* trust of which the deceased was the settlor. During the course of the litigation the plaintiffs-executors reached an agreement with Ruth P. Gonynor, who claims to be entitled to the principal of the trust, and these parties now wish to terminate the litigation. However, the American Mental Health Foundation, a contingent remainderman of the trust, has counterclaimed for additional relief, and that claim now constitutes the action. Special Term dismissed the cross complaint and directed distribution to Mrs. Gonynor. We disagree with that determination.

The settlor John Larendon was 75 years old in 1949. He was unmarried and was engaged in business with his brother Robert. That year he suffered a nervous breakdown and was hospitalized. Upon his discharge from the hospital he returned to his residence in California accompanied by a male nurse named Dalton. The same year he made a will leaving all his property to Robert, if he survived, and if not to Robert's wife if she survived, and failing that to the Society of the New York Hospital.

In 1950 Robert's wife died and Robert came to live with John. Both were looked after by Dalton and another male nurse named Kendall. In 1952 John made a new will, leaving the estate to Robert, but in the event he did not survive John, to relatives of Robert's deceased wife. In 1953 John made a new will, again leaving his estate to Robert, but, in case of his failure to survive, to Dalton, the male nurse. In 1955 the house in which the brothers lived burned down under what was described as strange circumstances, and Robert perished in the fire. Thereupon a new will was executed leaving legacies to four charities (not including the American Mental Health Foundation) totaling some $35,000, $10,000 to Kendall, and the residue to Dalton.

In 1959 a new testamentary plan was adopted: a will naming Dalton as the beneficiary, with Kendall as remainderman. A revocable trust, not the trust in question, was part of this plan. The income of the trust was payable to the settlor for life. Upon his death the principal was to be distributed as follows: $35,000 to Kendall and the balance to Dalton. If Dalton predeceased the settlor, one half to Kendall and the remaining half to Ruth Gonynor, Dalton's half sister. If neither Kendall, Dalton nor Gonynor survived the settlor, one half to Gretchen Kendall Nettles (Kendall's sister) and the remaining half to the American Mental Health Foundation. If none of these parties survived the settlor, the entire fund passed to the Foundation. And lastly, there was the trust in suit, which was irrevocable and consisted

of a corpus of $250,000. The sum was payable to Dalton for the period of the trust, 10 years, or until Dalton's earlier death. The principal upon termination was payable to the settlor or to whom he might by will appoint. In default of appointment it was payable to Dalton if living; if not, equally to Kendall and Gonynor. If neither survived, the distribution was in the same manner as provided in the 1959 will.

Shortly thereafter Dalton and Kendall had a falling out. As a result the revocable trust was revoked and a new will executed in which Kendall was left out as remainderman. Kendall has since died.

On November 19, 1960, Dalton gave the settlor a severe beating from which he died on December 7, 1960. Dalton was convicted of the murder on March 6, 1961. The 1960 will was denied probate in California on the grounds of undue influence. This left the 1959 will and, as no one objected, it was admitted to probate.

On this proceeding Dalton defaulted as did Mrs. Nettles. The only rights left in contest therefore would be John Larendon's estate, which would take the principal of the trust if it were declared invalid; Mrs. Gonynor, who is the primary remainderman who would take if the trust is valid; and the Foundation, which would take if the trust is valid and Mrs. Gonynor, disqualified from participating. As stated, the representatives of the Larendon estate have come to agreement with Mrs. Gonynor and they no longer contest the validity of the trust.

Addressing the first question, it is indisputable that the terms of the trust were dictated by Dalton. The testimony of Mr. Blossom, the attorney who drew the instrument, shows that while Mr. Larendon was of sound mind and fully capable of handling his affairs, he was completely under Dalton's dominance as to such things as Dalton wanted. When Dalton and Kendall were in accord, Kendall shared in the divesting of the estate. When they fell out, Kendall was eliminated. When asked why, all the settlor could say was that Dalton wanted it that way. True, this particular conversation related to the 1960 will, but a continuing pattern of Dalton's nefarious influence and his cumulating greed is only too evident. The successive wills, substantial gifts of cash and securities, the uncontradicted testimony that the settlor was in the habit of obeying Dalton in all things and would do nothing unless prompted by Dalton, all show this clearly. The motive is not far to find. Larendon was in physical fear of Dalton, and events showed that the fear was only too well justified.

It is indisputable law that a murderer cannot profit from his felonious act by inheriting from his victim (*Riggs* v. *Palmer,* 115 N. Y. 506) or by any other means (*Matter of Kaplan,* 49 Misc 2d 335). Nor can any property having this source pass through the murderer's estate to his heirs or devisees (*Bierbrauer* v. *Moran,* 244 App. Div. 87). It would seem that the disqualification should extend with equal force to his nominee.

While research has disclosed no actual decision in regard to the nominee of a murderer, that is explainable because the situation so seldom arises. In the rare cases where a wrongdoer has procured a gift to others not shown to have been privy to his wrong, the transfers to them have been avoided (*Bridgman* v. *Green,* 2 Ves. Sen. 627; *Matter of Hayes,* 49 Misc 2d 152). Perhaps the paucity of opinions on this subject is best explained by Lord HARDWICKE's expression of surprise in the *Bridgman* opinion that anyone would appear in a court of equity to contest it.

Trial Term was apparently of the opinion that it was not proved that Mrs. Gonynor was in fact the nominee of Dalton. Not only was she his half sister, she was virtually a stranger to the settlor. This, coupled with the dominating influence of Dalton over the settlor, was quite sufficient to apply to her the rule frequently employed in will contests that where these facts appear it is incumbent on the donee of the suspicious gift to come forward with evidence that the bequest was free of fraud or undue influence (*Matter of Putnam,* 257 N. Y. 140; *Matter of Carpen,* 15 A D 2d 773; *Matter of Satterlee,* 281 App. Div. 251).

The disqualification of Mrs. Gonynor does not, however, clear the Foundation's path to the bequest. In most instances where a beneficiary is denied a gift the disqualification results in the avoidance of the instrument or the transaction involved. This would be so where there was no other purpose or where the fraud or overreaching induced the entire transaction involved. There are exceptions where it is shown that any of several bequests are the legitimate intent of the testator while others are the result of fraud (*Matter of Maguire,* 105 Misc. 433; *Matter of Thorn,* 153 Misc. 28). Unfortunately for the Foundation, the evidence in this case does not rise to that standard. The fact that this institution would be a worthy recipient of the settlor's bounty while the others would not does not change this. Actually, there is no evidence, only conjecture, as to how the Foundation came to be eventual remainderman.

But, fortuitously for the Foundation, in the aspect in which the case reaches this court this question is not presented. There are only three remaining parties to the litigation: the estate of the settlor, Mrs. Gonynor and the Foundation. For reasons best

known to themselves, the representatives of the estate have joined with Mrs. Gonynor and the Foundation in insisting on the validity of the trust. This being so, the disqualification of Mrs. Gonynor does not affect the instrument. The Foundation, being the only party remaining entitled to claim under it and there being no contention that it should be disqualified as having any relationship with the murderer, should receive the fund.

Judgment entered March 5, 1971 dismissing the complaint and the cross complaint of defendant American Health Foundation and directing distribution to Ruth P. Gonynor should be modified, on the law and the facts, by annulling the direction for distribution and directing judgment in favor of American Mental Health Foundation on its counterclaim, and as so modified, affirmed with costs to all parties filing briefs payable out of the trust estate.

NUNEZ, J. P., KUPFERMAN, TILZER and MACKEN, JJ., concur.

Judgment, Supreme Court, New York County, entered on March 5, 1971, so far as appealed from, unanimously modified, on the law and the facts, by annulling the direction for distribution and directing judgment in favor of American Mental Health Foundation on its counterclaim, and as so modified, affirmed, with costs and disbursements to all parties filing briefs payable out of the trust estate.