[601 NYS2d 113]

In the Matter of the Estate of DIANE J. PIKUL, Deceased. WILLIAM M. O'GUIN et al., as Temporary Administrators of the Estate of DIANE J. PIKUL, Deceased, Appellants; ETHEL GRIFFIN, Public Administrator, as Administratrix of the Estate of JOSEPH J. PIKUL, Deceased, et al., Respondents.

First Department, August 5, 1993

**APPEARANCES OF COUNSEL**

*Diahn McGrath* for appellants.

**OPINION OF THE COURT**

MURPHY, P. J.

Diane Pikul was slain by her husband, Joseph Pikul, who was thereafter charged with having murdered her and, after a lengthy trial, found by a jury to be guilty of that offense. As it happened, however, Joseph Pikul died before he had been sentenced and his conviction was accordingly abated by operation of law.

Petitioners in the present proceeding are the temporary administrators of the estate of Diane Pikul. They seek a declaration to the effect that Joseph Pikul forfeited any right he may have had to succeed to the property of Diane Pikul by reason of his commission of Diane's murder; pursuant to the will of Diane Pikul, Joseph Pikul was to inherit Diane's entire estate if, of course, he survived her and if he did not the estate was to be divided between the couple's two children. In addition to the property which would have passed by will, Diane Pikul's estate seeks to retain for alternative disposition property jointly owned by the Pikuls upon the ground that Joseph Pikul's rights by reason of survivorship, no less than his right to take under Diane's will, were forfeited by his murder of Diane.

The principle is firmly established in equity that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his

own iniquity, or to acquire property by his own crime" (*Riggs v Palmer*, 115 NY 506, 511). It is then plain that if it had been established before the Surrogate that Joseph Pikul murdered Diane, he should have been disqualified from taking under her will or from the acquisition of any other right in property which would have been his as a surviving spouse.

Initially placed before the Surrogate in proof of Joseph Pikul's commission of his wife's murder were portions of the transcript of his criminal trial setting forth the jury's rendition of its guilty verdict and testimony by the defendant in which he admitted to having taken his wife's life but claimed that he had not murdered her. The Surrogate deemed this showing by the petitioners to be insufficient to demonstrate by a fair preponderance of the evidence Joseph Pikul's commission of the murder. She reasoned that the murder conviction having been abated, the only evidence before her was Joseph Pikul's admission of homicide and accompanying denial of the murder charge, which, of course, did not permit the conclusion that Joseph had in fact murdered Diane.

Petitioners thereafter renewed their request for declaratory relief, now supplementing their original evidentiary showing with a coroner's report indicating that the causes of Diane Pikul's death had been a series of blows to the head sufficiently forceful to precipitate subarachnoid bleeding, and strangulation, both manual and ligature, for a minimum of 40 seconds. The coroner's report also indicated that Diane Pikul's body had been found at a maintenance area on the New York State Thruway about 50 miles north of New York City some four days after she had been reported missing from her Amagansett home. Among additional submissions on the renewal motion, were further excerpts from Joseph Pikul's direct testimony at his trial. In these excerpts Joseph described how, after the homicide, while still in the Pikuls' Amagansett home, he wrapped Diane's body in a tarp which he then secured with a variety of ropes, and how he purchased ice at a local delicatessen since, as he put it, "I didn't know what I was going to do with Diane's body." Joseph also admitted to having deposited Diane's body in the spot where it was eventually found and to having placed a tire over it "as camouflage".

Although the Surrogate granted the petitioners' motion insofar as it sought renewal, she was of the view that the evidence was still "not sufficient to warrant declaratory judgment in petitioner's favor."

Contrary to the view expressed by the Surrogate, the uncontroverted showing made by the petitioners on renewal was at the very least adequate to demonstrate by a fair preponderance of the evidence that Joseph Pikul murdered his wife, Diane. As noted, Joseph himself in his direct testimony admitted to killing Diane, and the coroner's report in combination with Joseph's testimony as to his conduct in the aftermath of the homicide, bespeaks none too subtly the wrongful intent accompanying the admitted deprivation of life. It is uncontradicted on the record before the Surrogate that after taking his wife's life by beating her repeatedly about the head and choking her for a minimum of 40 seconds, Joseph Pikul then sought to conceal what he had done by wrapping the corpse in a tarp and transporting it a considerable distance in order to dispose of it in a place where he evidently intended that it would not be discovered. Obviously, Joseph Pikul's bare denial that he had committed murder did not, in light of the overwhelming proof to the contrary, create any issue as to whether the killing had been intended. It should be underscored that the burden of the petitioners in this civil proceeding was not to prove Joseph Pikul's guilt of murder beyond a reasonable doubt; all that was necessary was proof by a fair preponderance that he had intentionally taken his wife's life, and certainly the proof laid before the court met the applicable standard with ease. If there was evidence to counter the manifestly adequate prima facie showing of the petitioners, none was produced by the objectants.

While it is clear at least on the basis of the record upon renewal that the petitioners were entitled to the declaratory relief sought, to premise our decision upon that showing might create what we believe would be a mistaken impression that the showing initially made by petitioners, consisting principally of proof of the jury's verdict against Joseph Pikul, had been insufficient to warrant the requested relief.

We cannot agree with the Surrogate that the abatement of Joseph Pikul's conviction by reason of his death deprived the jury's verdict of all probative significance in the present context. A prosecution in which the defendant dies prior to appeal is abated simply because there will be no appeal, and the reliability of the conviction will never be the subject of appellate scrutiny *(People v Mintz,* 20 NY2d 770; *People v Matteson,* 75 NY2d 745). A conviction, which has been impossible to test by means of appeal, may not be adduced as conclusive proof of the crime with which the defendant had

been charged. This does not mean, however, that a jury's verdict should be accorded no weight at all in collateral civil proceedings in which the defendant's commission of the crimes for which he had been prosecuted is once again at issue. Indeed, it would seem to us that a jury's unanimous vote to convict a defendant after seeing and hearing all the evidence adduced at the defendant's criminal trial, would at least presumptively establish the defendant's guilt in collateral civil litigation. After a jury has rendered its verdict, the burden of demonstrating the verdict to have been defective lies with the party challenging it. Thus, just as a criminal defendant challenging his conviction on appeal must bear the heavy burden of demonstrating the verdict to have been erroneously obtained, so a civil litigant seeking to relitigate an issue determined by a jury in a criminal case must demonstrate the presumptively valid verdict to have been tainted by some error in the underlying proceedings fundamentally impairing the reliability of the jury's determination. It is, we think, only once a conviction has been shown thus compromised that the issues purportedly concluded within it may be retried. As noted, a prosecution is abated by the death of a defendant because the verdict will not be tested; however, once the validity of a verdict is to be tested, as it would be at least implicitly in collateral proceedings in which identical issues are raised, the reason for the abatement disappears; the verdict should then be entitled to at least the same presumption of validity that any verdict would enjoy on appeal. If there are reasons why the verdict should be deprived of significance, those reasons can and should be litigated in the collateral context, the death of the defendant notwithstanding, and if the party advocating a result different from that reached by the jury is unable to demonstrate that the verdict was the outcome of a trial so flawed as fundamentally to compromise the reliability of its outcome, we can perceive no reason why the verdict should not stand as a bar to relitigation. A different rule requiring that an abated conviction be treated as a nullity in all circumstances would, as a matter of course, force the relitigation in a civil context of matters previously and exhaustively litigated under the significantly more demanding standards of proof applicable where criminal liability is at issue. Obviously, the interests of judicial economy would not be promoted by such a rule. Nor would the reliability of the determination in the collateral proceeding be in any measure insured, for clearly the unanimous conclusion

of 12 jurors that a defendant's guilt has been proved beyond a reasonable doubt must, at least presumptively, be regarded as the most reliable finding on the issue our system of justice can offer; certainly, there is no reason to suppose that a de novo finding made by the Surrogate or any other collateral court that the evidence of guilt was preponderant or, for that matter, was not, would be any more reliable than a jury verdict the validity of which had not been cast in doubt.

It follows from what we have said that petitioners ought not to have been required to make any showing beyond that of the jury's verdict to demonstrate a prima facie right to the relief sought. Once that showing had been made, it became the burden of the objectants to demonstrate that the verdict had not been reliably obtained. Only in the event of a satisfactory showing in this regard by the objectants should the petitioners have been required to prove de novo by a preponderance of the evidence that Joseph Pikul had intentionally taken the life of the person to whose property his estate lays claim.

Accordingly, the order of the Surrogate's Court, New York County (Eve Preminger, S.), entered July 29, 1991, which denied the petition for a declaration that Joseph Pikul forfeited any right to the property of Diane Pikul or to property held by the Pikuls jointly, by reason of having intentionally killed her, should be reversed, on the law, and the requested declaration in favor of petitioners made, without costs; and the appeal from the order of the same court entered on or about December 5, 1991, which, upon renewal, denied petitioners the requested declaratory relief, dismissed as academic, without costs.

ROSENBERGER, KASSAL and RUBIN, JJ., concur.

Order, Surrogate's Court, New York County, entered July 29, 1991, reversed, on the law, and the requested declaration in favor of petitioners made, without costs; and the appeal from the order of the same court entered on or about December 5, 1991, which, upon renewal, denied petitioners the requested declaratory relief, dismissed as academic, without costs.