OPINION OF THE COURT
Edward W. McCarty III, J.
In this proceeding for leave to compromise an action for wrongful death, the adequacy of the settlement was approved by the order of the Supreme Court, Nassau County, the Honorable Thomas Feinman, on March 7, 2012. Justice Feinman’s order also fixed attorneys’ fees and disbursements and, by discontinuing the cause of action for conscious pain and suffering, effectively allocated all of the net proceeds to the cause of action for wrongful death. Pursuant to Justice Feinman’s order, the net proceeds of $162,271.96 are to be held by plaintiff’s counsel in an “interest bearing escrow account pending a Surrogate’s decree distributing the net proceeds to the appropriate distributees.”
The facts of this case make that determination a case of first impression in New York. Although the New York courts have addressed the question of whether a person who is found not responsible by reason of mental disease or defect (insanity) is disqualified from sharing in the estate of his victim under the doctrine enunciated in Riggs v Palmer (115 NY 506 [1889]), no New York court has decided the specific issue before this court, i.e., whether a person who pleads not guilty by reason of mental disease or defect in a criminal proceeding is disqualified from sharing in the proceeds of a wrongful death compromise arising out of the killing of her children at her own hands. Today this court answers that question in the affirmative and finds that, based upon the principles of equity and a lower standard of mens rea applicable in the civil context, the respondent Leatrice Brewer is disqualified as a distributee of her children, Innocent, Jr. and Michael.
The petitioner father, Innocent Demesyeux, Sr., has the burden of proof on whether Leatrice Brewer is disqualified. The *732 petitioner father and the guardian ad litem for possible unknown distributees rely on the doctrine articulated in the seminal case Riggs v Palmer (115 NY 506 [1889]). In that case, the Court held that a grandson could not inherit from his grandfather where he had murdered his grandfather in order to inherit from him. In Riggs v Palmer (115 NY 506, 511 [1889]), the Court of Appeals articulated the long-accepted principle that “[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime.” The principle appears to be an adaptation of the equity maxim “ex turpi causa non oritur actio,” or in other words, that persons may not rely upon their own violations of law as a basis for a claim.
The court notes that while the Riggs v Palmer doctrine is relevant to the circumstances before us in this case, since the issue of Ms. Brewer’s disqualification has been raised in the context of the compromise of a wrongful death action, the court’s analysis must begin with the wrongful death statute.
Thus, the court must analyze whether under the relevant wrongful death statutes, Ms. Brewer should be disqualified from receiving a share of the wrongful death proceeds on the basis that her children died as a result of her actions. A basic consideration in the interpretation of a statute is the general spirit and purpose underlying its enactment, and that construction is to be preferred which furthers the object, spirit and purpose of the statute (Rankin v Shanker, 23 NY2d 111 [1968]). Therefore, the courts in construing a statute should consider the mischief sought to be remedied by the legislation, and they should construe the act in question so as to suppress the evil and advance the remedy. Moreover, “courts generally interpret a statute to conform with common-law concepts where the letter of the statute is silent about consequences analogous to situations governed by common-law principles” (2B Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 56:3 [7th ed]).
EPTL 5-4.3 (a) provides, in pertinent part, that the damages awarded in a wrongful death action represent “fair and just compensation for the pecuniary injuries resulting from the decedent’s death” (emphasis added). The damages are to be distributed “in proportion to the pecuniary injuries suffered by the decedent’s distributees.” A parent may suffer a pecuniary injury if the parent had an expectation of the child supporting *733 or otherwise financially helping such parent later in life. It is, of course, something of a fiction for a parent to have an expectation of support from his or her minor children. But, even assuming proof of such a pecuniary injury, EPTL 4-1.4 (a) provides that a parent may be disqualified as a distributee for purposes of EPTL 5-4.4 if the parent abandons the child. Abandonment amounts to a voluntary breach or neglect of the duty to care for and train a child and the duty to supervise and guide the child’s growth and development (Matter of Wigfall, 20 Misc 3d 648, 652 [Sur Ct, Westchester County 2008]). Viewed in the context of this wrongful death proceeding, the real issue before the court is whether, even assuming that Ms. Brewer suffered a pecuniary loss as a result of the deaths of Innocent and Michael, she is entitled to receive “fair and just compensation” on account of such pecuniary loss or whether she has forfeited that right.
In Mark G. v Sabol (180 Misc 2d 855 [Sup Ct, NY County 1999]), the decedent’s mother and father physically abused their son, culminating in his death. The father pleaded guilty to manslaughter in the first degree and the mother pleaded guilty to two counts of assault in the second degree. Similar to this case, the decedent’s estate commenced a wrongful death action against the City of New York and related entities claiming that the defendants were aware of the ongoing abuse and failed to prevent it. The court went on to find that the father was clearly disqualified as a distributee because he pleaded guilty to first-degree manslaughter. Although the mother pleaded guilty only to assault, the court held that the mother was also disqualified not only on the common-law principle of Riggs v Palmer but also on the grounds of abandonment under EPTL 4-1.4 (a). The court found that the situation fit “within the ambit of the statute in wording and in spirit” even though it might not “be exactly what the drafters had in mind” (id. at 860). The court found that the mother was disqualified based upon her abuse and abandonment.
In addition, in Estate of Pesante v Mundell (37 AD3d 1173 [4th Dept 2007]), the decedent child died while in foster care, after having been removed from her home as a result of the mother’s neglect. Thereafter, the mother sought a share of the wrongful death proceeds. The Court held that the mother had no cognizable claim for pecuniary loss because the decedent had been placed in foster care based upon her own neglect. The mother failed to establish that she had a reasonable expectation of future assistance from the decedent and failed to establish that she was entitled to damages for future pecuniary loss.
*734 Ironically, in the instant case, the court notes that the gravamen of the wrongful death proceeding against the County of Nassau was that Child Protective Services failed to remove the children from Leatrice Brewer’s care. Had the children been taken from Leatrice, as the Court in Pesante pointed out, she would not have had a reasonable expectation of future assistance from the children.
In Mark G. v Sabol and Estate of Pesante, the courts concluded that neither parent had a right to receive “fair and just compensation” for the loss of their child where their actions amounted to an abandonment of the child, and in the case of Sabol, actually resulted in the child’s death. Complicating the situation here, however, is Ms. Brewer’s plea of not responsible by reason of mental disease or defect.
Here, the common-law doctrine articulated in Riggs v Palmer is relevant to the question of whether Ms. Brewer’s plea prevents her disqualification as a distributee for purposes of the allocation of the wrongful death proceeds.
It is well established law that one who takes the life of another should not be permitted to profit from his own wrong and shall be barred from inheriting from the person slain (Matter of Covert, 97 NY2d 68 [2001]; Riggs v Palmer, 115 NY 506 [1889]; Matter of Miller, 17 Misc 2d 508 [Sur Ct, Nassau County 1959]; Matter of Sparks, 172 Misc 642 [Sur Ct, NY County 1939]). In Riggs v Palmer (115 NY 506, 511 [1889]), the Court of Appeals articulated the basic principle that “[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime.” Although there is no express statutory provision in New York denying, to one who killed, the right to inherit from his victim (but cf. EPTL 4-1.6 [regarding joint bank accounts]), numerous cases since Riggs v Palmer have reaffirmed the applicability of the common-law general principle that one should not be permitted to profit by taking the life of another and, in particular, that one who feloniously murders shall not be entitled to share in his victim’s estate (Matter of Covert, 97 NY2d 68 [2001]; Petrie v Chase Manhattan Bank, 38 AD2d 206 [1st Dept 1972], mod 33 NY2d 846 [1973]; Matter of Jacobs, 2 AD2d 774 [2d Dept 1956], affd 3 NY2d 723 [1957]; Bierbrauer v Moran, 244 App Div 87 [4th Dept 1935]; Matter of Kirkman, 120 Misc 2d 278 [Sur Ct, Broome County 1983]; Matter of Bach, 81 Misc 2d 479 [Sur Ct, Dutchess County 1975], affd 53 AD2d 612 [2d Dept 1976]; Matter of Grey v Levitt, 76 *735 Misc 2d 720 [Sup Ct, Albany County 1974]; Matter of Loud, 70 Misc 2d 1026 [Sur Ct, Kings County 1972]; Matter of Miller, 17 Misc 2d 508 [Sur Ct, Nassau County 1959]). These cases hold essentially that there is no vesting of the estate in the wrongdoer because the crime precludes the wrongdoer from becoming a distributee CMatter of Sparks, 172 Misc 642 [Sur Ct, NY County 1939]; Matter of Wolf, 88 Misc 433 [Sur Ct, NY County 1914]).
The application of the Riggs v Palmer principle is not always straightforward, and not all wrongful conduct will disqualify a person as a distributee (6 Warren’s Heaton, Surrogate’s Court Practice § 74.13 [7th ed rev]). This court has held that “[a] criminal conviction either by plea or after trial is conclusive proof of its underlying facts in a subsequent civil proceeding and collaterally estops a party from relitigating the issues” (Estate of Mirissis, NYLJ, Mar. 16, 1993 at 25, col 3 [Sur Ct, Nassau County 1993]). In Mirissis, this court held that a de novo hearing was not necessary in order to prove that the wrong was intentional where the killer entered a plea to manslaughter in the first degree (see also Matter of Loud, 70 Misc 2d 1026 [Sur Ct, Kings County 1972]). Nevertheless, this court held that before declaring a forfeiture on the part of the killer, “the court should review the transcript of the minutes of the pleas” (Estate of Mirissis, NYLJ, Mar. 16, 1993 at 25, col 3 [Sur Ct, Nassau County 1993]).
New York courts have specifically dealt with the issue of whether a person who is found not responsible by reason of insanity is disqualified from sharing in his or her victim’s estate. As stated previously, none of these cases addressed this issue in the context of a wrongful death proceeding. In Matter of Wirth (59 Misc 2d 300 [Sur Ct, Erie County 1969]), a man killed his wife and was found not responsible by reason of insanity. The court held that the husband was entitled to his intestate distributive share.
In Matter of Fitzsimmons (64 Misc 2d 622 [Sur Ct, Erie County 1970]), a man was found not responsible by reason of insanity for killing his parents. The psychiatric testimony showed that the son was insane at the time. The court held the son was entitled to take as a distributee.
Similarly, in Matter of Lupka (56 Misc 2d 677 [Sur Ct, Broome County 1968]), the decedent died from an assault committed by her husband. The court held that the husband could inherit under the will of his wife because of his mental condition.
*736 In Matter of Eckardt (184 Misc 748 [Sur Ct, Orange County 1945]), a woman who was a somnambulist killed her husband. She was acquitted on the grounds that she did not know the nature and quality of her act. The court reasoned that the wife was not profiting from her own wrong since she had not done anything “legally wrong.”
Matter of Bobula (19 NY2d 818 [1967]) involved a man who shot his wife and then committed suicide. In a prior decree, not appealed, the Surrogate had determined that the deaths of the husband and wife were simultaneous and determined that the assets of the estates should be distributed accordingly. The appellate court reversed and instead found that certain estate assets should be considered part of the wife’s estate solely because of the husband’s involvement in his wife’s death. The Court of Appeals reversed and remanded the case to the Surrogate’s Court to determine whether the killing occurred under circumstances which would exculpate the killer from criminal liability, e.g., if he were legally insane. The Court of Appeals stated that if it be determined that the husband was legally insane and “there could have been no successful prosecution of [the husband] had he lived,” then the property should be distributed as originally determined by the Surrogate’s Court — as if the parties had died simultaneously (Matter of Bobula, 19 NY2d 818, 819 [1967]). At issue, in Matter of Bobula, was the distribution of joint assets. Matter of Bobula did not involve the disqualification regarding the wife’s assets, but rather dealt only with the issue of the husband’s share of the jointly-held assets. Furthermore, the parties had conceded that “the estate of John Bobula, deceased, shall not share in any of the assets that belonged exclusively to Marian Bobula at the time of her death” (Matter of Bobula, 45 Misc 2d 745, 746 [Sur Ct, Erie County 1965]).
This case is a classic illustration of the equitable dilemma between two moral public policies. On the one hand, the holdings in the New York cases cited above demonstrate the judicial attempt to apply the enlightened definition of criminal insanity recognizing that there should be no punishment where the slayer is mentally ill. On the other hand, principles of equity, justice and morality dictate that one should not profit from his own wrong. These competing interests are present under the circumstances of this case and such interests must be weighed and balanced by this court. While this court has struggled with the plea of “not guilty by reason of mental disease or defect,” *737 the court is also cognizant of Leatrice Brewer’s admissions concerning the methodical manner in which she took the lives of her three children. To ignore Leatrice Brewer’s own admissions concerning her children’s deaths by allowing her to share in a fund which would otherwise not have existed but for her conduct disturbs the conscience of the court. This court is a court of equity.
“A court of equity, in its endeavors to maintain, promote, and enforce the interests of justice, stringently demands good faith, fairness and uprightness from the litigants who come before it. This basic rule is stated in the form of an ancient and most favored principle or maxim, known by every law student, that he who comes into equity must come with clean hands. It is well established that our courts will not grant relief to one who comes into equity with unclean hands” (Matter of Murphy, NYLJ, Sept. 15, 1999 at 30, col 2 [Sur Ct, Richmond County 1999]).
In addition, it is
“ ‘an old, old principle’ that a court, ‘even in the absence of express statutory warrant,’ must not ‘ “allow itself to be made the instrument of wrong, no less on account of its detestation of every thing conducive to wrong than on account of that regard which it should entertain for its own character and dignity” ’ ” (Campbell v Thomas, 73 AD3d 103, 119 [2d Dept 2010], citing Matter of Hogan v Supreme Ct. of State of N.Y., 295 NY 92, 96 [1946]).
Accordingly, this court adopts the position of the dissent in Ford v Ford (307 Md 105, 512 A2d 389 [1986]). One who is found not guilty by reason of mental disease or defect is excused from criminal punishment for her crime. Nevertheless, the principles of morality and equity dictate that the murderer is still morally responsible for her crime. A finding of insanity in the criminal context is not tantamount to an absence of a mens rea necessary in this context to render Ms. Brewer disqualified as a distributee. Here, by her own admission, Ms. Brewer stated that she intended to kill her children to protect them from voodoo. She acknowledged at her plea allocution that she intended to cause her children’s deaths. Ms. Brewer was consciously aware of the risk that could follow from her actions — her children’s deaths. In fact, their deaths were exactly the results she intended. The court notes that this situation is *738 different from the situation where a parent’s negligent conduct resulted in the child’s death (see Matter of Wigfall, 20 Misc 3d 648 [Sur Ct, Westchester County 2008]). Leatrice Brewer intended her actions to cause Michael and Innocent to die. In fact, realizing that her initial attempt to kill her other child, Jewell, did not result in Jewell’s death, Ms. Brewer tried an alternate method to bring about Jewell’s death. While not criminally responsible, this court will not relieve Ms. Brewer from moral responsibility.
As the dissent in Ford stated:
“[T]he fact that the State cannot criminally punish an insane defendant is irrelevant to a determination of whether it is equitable for the killer to inherit from her victim. It is one thing to say that the State should not imprison one who was insane when she committed the murder. It is quite another to say that the insane murderer can profit from her crime. The only relevant focus here must be upon the killer’s moral and personal responsibility for the crime. . . .
“If the insane killer has intentionally killed her victim, if she has acted with the required mens rea for the crime, she is personally and morally responsible for her wrong, and equity demands that she shall not benefit from the deed. It is repugnant to decency to say that an insane murderer can finance her rehabilitation with new found wealth from her victim’s estate.” (Ford v Ford, 307 Md 105, 138-139, 512 A2d 389, 406-407 [1986].)
Under the circumstances present here, equity must intervene to combat the unjust enrichment that would inure to Leatrice Brewer in the absence of a finding of disqualification. While not criminally accountable by virtue of her mental disease or defect, she is accountable in this court by virtue of possessing the requisite mens rea to cause the deaths of her children. Moreover, here there is a direct causal link between her wrongdoing and the benefit she seeks. Unlike the New York cases cited above, there are no assets in the children’s estates. The only fund is composed of the settlement proceeds from the wrongful death action. The fund only exists because of Ms. Brewer’s wrongful conduct. But for her killing of Innocent and Michael, there would be no fund to allocate.
Accordingly, based upon the spirit of “fair and just compensation” under the wrongful death statute and that Ms. Brewer *739 possessed the requisite mens rea of intention for disqualification as a distributee, albeit not the requisite mens rea for criminal punishment, the court finds she is disqualified both as having abandoned her children, Innocent and Michael, and on the equitable principle that the court should not assist a wrongdoer in profiting from his or her wrong. This court adopts the Brewer Rule that a person found not responsible for a crime due to mental disease or defect who has the ability to recognize that her conduct was morally wrong when undertaken shall not financially benefit from that action.
It has come to the court’s attention that Ricky Ward, the father of Ms. Brewer’s daughter Jewell Ward, has been convicted of a felony. Limited letters of administration with respect to Jewell’s estate issued to Ricky Ward on September 24, 2009. In view of Ricky Ward’s conviction, the court hereby revokes the limited letters of administration issued to him (SCPA 707 [1] [d]) and issues limited letters of administration to the Public Administrator upon his duly qualifying under the law.